OPINION
Appellant appeals from his conviction after a jury trial in the Clermont County Common Pleas Court of aggravated burglary, attempted rape, and two counts of intimidation of a crime victim.
Gwen Hughes testified she lived in New Richmond, Ohio with her husband, Calvin, and their three children. She said she met the defendant when he began working with her husband several years before the incident in question. Mrs. Hughes stated that the defendant and his wife had been in her home on a few occasions. She said he began visiting her home when her husband was at work. (Tr. 150).
Mrs. Hughes testified that the defendant came to her home in the late morning of March 21, 1994 and because the defendant made her uncomfortable by his visits, she and her son, Andrew, hid in her upstairs bathroom. Mrs. Hughes testified that although she believed she had locked the doors to her house, the defendant somehow gained entry to her home.
Mrs. Hughes testified that when she discovered the defendant's presence in her house, she confronted him and asked him what he was doing in her home. She said the defendant said he heard someone yelling for help so he entered the house to see if he could help. (Tr. 154).
Mrs. Hughes testified she kept telling the defendant that she couldn't believe he entered her home and that his entry had scared her. She said although the defendant was usually jovial he had a very scary grim look on his face on this day. (Tr. 155). She said she made small talk while her son went into the living room to watch television.
During this conversation, Mrs. Hughes told the defendant that she and her husband had been working on their son's room. She said the defendant asked to see Andrew's room which adjoined the kitchen. She then testified as follows:
 Q. All right. So, you go into the bedroom or you show him where it was. What happens from that point?
 A. I walked just a few steps into the bedroom. As a matter of fact, there was only enough room between myself and the door for Claude. I mean, that's all the farther into the bedroom I went at the time. And directly in front of us was Andrew's bed, like were talking a matter of maybe a foot.
 Q. Like off to the side, slightly offset from the door as you go in?
 A. No. Yeah. If you would walk into the bedroom at the time, his bed would have been like a foot inside the door, to the left.
Q. All right.
 A. We walked straight into the bedroom. There's closet doors right there behind his door. And so I thought — I walked only far enough in to show him the bedroom. And at that point, out of the corner — I was just showing him what we were doing, and at that point out of the corner of my eye I saw him reach around and start to shut the bedroom door. And my first instinct was I reached around to grab the door, and at that point he grabbed me.
 Q. He was physically handling the knob to shut it or he was pushing the door shut?
 A. He physically pushed it shut, yes. It doesn't close on its own.
 Q. That's what I was going to ask you. And you reached around to grab the knob?
A. Right.
Q. And then what happened?
A. Then he grabbed me.
 Q. Now, if you could describe to the jury the best way you can recall, how did he grab you?
 A. I remember he grabbed me with one hand like this.
Q. Over your mouth?
 A. Over my mouth. And the other hand went around my chest like this. He had both arms in one arm.
Q. Like a bear hug sort of —
A. Yes.
Q. — would that be a way to describe it —
A. Yes.
 Q. — with his one arm and his hand over your mouth with the other?
A. Yes.
 Q. Did he cut you at that point in any manner or bruise you, that you know?
A. No.
Q. Did you have any bruises later because of this?
A. No, I didn't.
 Q. So, he had you in a bear hug with one arm, hand over the mouth with the other?
A. Right.
 Q. What, if anything, did he do or say at that point?
 A. He told me at the time that he had a gun. He told me if I didn't do what he said, that he would hurt "the boy". He did not call him by his name. And he repeated that two to three times.
Q. What happened from there?
A. He told me to sit down on the bed.
Q. He told you?
 A. He also told me that if I did whatever he said, he would not hurt me and he would not hurt the boy.
Q. Did he ever specify what he meant?
A. No.
Q. He just said, "Do what I tell you"?
A. Right.
 Q. "I won't hurt you and the boy." But he said that more than once?
A. Yes, he did.
Q. And he told you to sit on the bed?
A. Yes, he did.
Q. Okay.
 A. And at that time I sat down. And he was standing right in front of me. And I noticed at the time — I mean, I was like right at eye level, like this far from him — I noticed at that time that his jeans were unzipped.
Q. Had you noticed his jeans before that?
A. No, I hadn't.
 Q. So, you can't say if they were unzipped earlier or not?
A. No, I can't.
 Q. But you did notice at that point his jeans were unzipped?
A. Yes, I did.
Q. What happened from there?
 A. At that point I guess I realized what was happening and I sort of doubled over. I have an arrhythmia, which is an irregular heartbeat. And it is brought on by anxiety and things of that nature. And —
 Q. Okay. Now, let me stop you. Prior to that point in time that you just described, did you have an anxiety attack out in the hallway —
A. No, I didn't.
 Q. — when you were talking to him? When you were in the kitchen having a drink?
A. No, I didn't.
Q. When did the anxiety attack first hit you?
A. About the time that I sat down on the bed.
Q. After he grabbed you and threatened you?
A. Yes.
 Q. Okay. So, what happened then? You're passing out or you're collapsing or whatever?
 A. I didn't pass out, but I more or less just doubled over. It's very difficult to breathe. And I more or less just kind of doubled over onto the floor at that time.
Q. Like in the fetal type of position?
A. Yes.
Q. Okay. Then what happened?
 A. He was asking me what was wrong. And he kept telling me, "Don't pass out on me." And that was basically it. He asked me if he could get me anything to drink, if he could get me a glass of water. And he just kept telling me, "Don't pass out on me. Don't pass out on me."
Q. Did you lose consciousness at all?
A. No, I did not.
Q. You were still alert?
A. Right, yes.
 Q. Awake, but you were going through this. And it was a medical condition that you had at the time?
A. Right.
Q. Okay. What happened from that point?
 A. I told him that I would feel better if I got out of the bedroom. And at that point he let me out. And I went and sat on the steps.
 Q. So, you came out here and were back on these steps again?
 A. Yes. And I just sat down on the steps. And at this point he was kneeling on the floor in front of me trying to still reassure me that, you know, if there was anything he could do or, "Don't pass out on me." And he kept apologizing. He said he was sorry. And he said, "Please don't tell anyone. Please don't tell your husband. If you don't tell anybody," he said, "I will get out of town, I'll never bother you or your husband again." (Tr. 158-163).
Mrs. Hughes testified that when the phone rang, the defendant left her house. She testified that it was her mother on the phone and she told her mother that the defendant had been at her home. Since she seemed very upset, her mother, Barbara Hoyt, came over to Mrs. Hughes' home immediately. After Mrs. Hughes explained to her mother what had happened, Mrs. Hoyt called the New Richmond police.
Mrs. Hughes testified she received several telephone calls from the defendant after the incident. She said he called her in April 1994 and told her she should drop the criminal charges against him because he didn't like being falsely accused. She said the defendant said "he had people in Chicago that would love to get their hands on me and that I better watch my back." (Tr. 176). Mrs. Hughes testified she received several phone calls on the morning she was to testify before the grand jury from the defendant. She said in these calls he again threatened her. (Tr. 178).
On cross-examination, Mrs. Hughes acknowledged she never saw a gun in the defendant's hand during the incident. She acknowledged he never tried to remove any of her clothing. (Tr. 203). On redirect examination, Mrs. Hughes testified she received a call from the defendant a couple of months before the incident of March 1994 in which the defendant told her how large his penis was and how his wife could not take it all and wondered if that would be a problem for Mrs. Hughes. She said she couldn't make any sense out of this conversation because she had never had such a conversation with the defendant in the past. (Tr. 214).
Barbara Hoyt testified and corroborated her daughters testimony. She said her daughter was very upset on the day of the incident and resisted her pleas to call the police because of her concern the defendant would make good his threats. (Tr. 220). She said she called the police and waited until her daughter spoke with them. She said her daughter suffers from a defective heart valve which produces irregular heartbeats and anxiety attacks. (Tr. 225). She said that when she arrived at her daughter's home on the day of the incident she was almost incoherent and insisted on locking the back door to her residence.
Chief Harold Kennedy of the New Richmond Police Department said he responded to Mrs. Hughes' call on March 21, 1994. He said Mrs. Hughes was very emotional but relayed the events of the morning to him. Kennedy said he could find no evidence of a forced entry into the Hughes' residence.
Kennedy testified that two days after the incident he received a telephone call from the defendant who asked him if there were "any warrants for him." (Tr. 263). Kennedy said he told the defendant there were no warrants but that he wanted to talk to the defendant. He said the defendant said he knew what the Chief wanted to talk to him about. The defendant volunteered he had been to the Hughes' house on March 21, 1994 and entered it because he heard Mrs. Hughes screaming. Kennedy said the defendant said he thought Mrs. Hughes was having a heart attack but he didn't elaborate.
Kennedy never told the defendant the nature of Mrs. Hughes' complaint. Despite the defendant's promise that he would immediately come to the police department, the defendant failed to appear. Kennedy testified despite his efforts to find the defendant, it was two years before the defendant was finally arrested for the offenses of which he was convicted.
At the conclusion of the State's evidence, the defendant moved for a judgment of acquittal pursuant to Crim.R. 29. When the trial court overruled the defendant's motion, the defense rested without producing any defense witnesses.
In his first assignment of error, Keenan contends the trial court erred in denying his motion for acquittal on the attempted rape charge. The defendant contends that even when viewing the evidence most favorably to the State, there is virtually no evidence showing that he attempted to rape Mrs. Hughes.
The State contends the State presented a prima facie case of attempted rape in light of Mrs. Hughes' testimony that the defendant physically assaulted her in her son's bedroom, while his pants were unzipped and threatened to harm her and her child if she didn't cooperate. The State notes the defendant had earlier made sexual remarks suggestive of intercourse to the victim.
R.C. 2923.02 provides that no person, purposely or knowingly . . . shall engage in conduct that, if successful, would constitute or result in the offense. A "criminal attempt" occurs when one purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in the commission of the crime. To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose. State v. Woods (1976), 48 Ohio St.2d 127.
In State v. Powell (1990), 49 Ohio St.3d 255, the Ohio Supreme Court sustained the defendant's attempted rape conviction. The court found the defendant ordering a seven year old child to take off her clothes was strongly corroborative of his criminal purpose to engage in sexual conduct with her and was thus a "substantial step" under Woods.
In State v. Heinish (1990), 50 Ohio St.3d 231, 238-239, the Court held that attempted rape requires that the actor intend to compel to submission to sexual conduct by force or threat and (2) commit some act that "convincingly demonstrates" such intent. In Heinish, the Court found a saliva stain found on the deceased victim's jeans which were partially unzipped and pulled down from her hips was insufficient to sustain an attempted rape conviction.
In State v. Davis (1996), 76 Ohio St.3d 107, the Court found that a deceased victim's nude body with finger marks on her left thigh was insufficient to sustain an attempted rape conviction.
We find that the trial court properly overruled the defendant's Crim.R. 29 motion. A rational jury could conclude beyond a reasonable doubt that the defendant's conduct amounted to attempted rape. We agree with the State that the defendant's conduct constituted a substantial step toward the commission of the crime of rape. His conduct was strongly corroborative of this criminal purpose. The first assignment of error is overruled.
In his second assignment appellant contends the jury erred and lost its way in rendering jury verdicts on all four counts in the indictment. He contends the verdicts were against the manifest weight of the evidence.
In State v. Thompkins (1997), 78 Ohio St.3d 380, the Court held when a court of appeals addresses an assignment that the judgment is against the manifest weight of the evidence, it should weigh the evidence and all reasonable inferences therefrom, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence the jury clearly lost its way and created a manifest injustice. The court noted the discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. (Citing State v. Martin (1983), 20 Ohio App.3d 172,175.
We have carefully reviewed the evidence and we find no reason to disturb the jury's verdicts. There was credible evidence in the record that the defendant trespassed into Mrs. Hughes' home with purpose to rape her. There was credible evidence provided by Mrs. Hughes of the attempted rape. There was also credible uncontradicted evidence given by her of two instances of intimidation. The second assignment of error is overruled.
In his third assignment, the defendant contends he received ineffective assistance of counsel in violation of his Federal and Ohio constitutional rights. Specifically, the defendant contends his trial counsel was ineffective because he did not have him testify in his own defense, and because counsel opened the door to damaging redirect testimony by Mrs. Hughes about the defendant's wife being unable to accommodate the defendant's sexual prowess.
Determining ineffectiveness of counsel involves a two step process. First, the appellate court must determine whether there was a substantial violation of defense counsel's duties to his client, and second whether the defense was prejudiced by counsel's ineffectiveness. State v. Jackson (1980), 64 Ohio St.2d 107.
The decision to place the defendant on the stand in his own defense is one of the most difficult decisions defense counsel has to make in the course of a criminal trial. Where the state's case is not particularly strong, the defendant may convict himself by taking the stand if he does not appear to be a credible person. In this case, defense counsel effectively cross-examined Mrs. Hughes and raised several questions about her credibility. She could not explain how the defendant entered her house after she locked it. There was no evidence of forced entry. She admitted she was not injured and she conceded she did not immediately call the police about the incident.
Counsel's cross-examination question of Mrs. Hughes was a fair one in light of the defendant having been in the Hughes' home on other occasions. In short, we cannot find that there was a substantial violation of defense counsel's duties to the defendant in this case. Also, we cannot say that there was a reasonable probability that the defendant would have been acquitted had he testified and his counsel not asked the question which precipitated Mrs. Hughes' response. See, Strickland v. Washington (1984), 466 U.S. 668; 104 S.Ct. 2052. The third assignment of error is likewise overruled.
In his last assignment, he contends the trial court erred in instructing the jury that they could consider defendant's flight after the alleged crimes as evidence of his guilt. The trial court instructed the jury as follows:
 Testimony has been provided by the State that the Defendant fled or attempted to avoid prosecution after committing the offense set forth in the indictment. This evidence has been presented by the State for the very limited purpose of showing consciousness of guilt on the part of the Defendant for the purpose of showing his guilt. It was not received and may not be — and you may not consider it for any other purpose.
 In considering this evidence you will decide whether the testimony of the Defendant's conduct is true. If you find that it is true you should consider that there are other innocent reasons — you should consider that there may be other innocent reasons to explain the Defendant's conduct. If you find that the testimony is true and you find that the Defendant's conduct was not motivated by consciousness of guilt or if you are unable to determine what the Defendant's motivation was you should not consider the evidence for any purpose.
 However, if you find that the testimony is true and you find that the Defendant's conduct was motivated by consciousness of guilt you may consider that evidence in determining whether or not the Defendant is guilty of one of more of the offenses charged. You will determine the weight, if any, to be given to this evidence. (Tr. 396-397).
The appellant contends the trial court, by giving this instruction over his objection, violated its duty to remain impartial and abused its discretion because the instruction created the impression that if the defendant disappeared after the alleged crime he must be guilty.
In State v. Eaton (1969), 19 Ohio St.2d 145, the Court held that flight from justice, and its analogous conduct, may be indicative of a consciousness of guilt. The instruction properly informed the jury that they could consider the defendants flight as evidence of guilt but were not required to do so. The assignment of error is without merit.
The judgment of the trial court is Affirmed.
YOUNG, P.J., and WALSH, J., concur.
(Honorable James A. Brogan of the Court of Appeals, Second Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).