OPINION
This timely appeal arises from a Mahoning County Common Pleas Court judgment finding Appellant, Christopher Chapman, guilty of aggravated murder, aggravated robbery and attempted murder, each with a firearm specification. For the following reasons, we affirm the judgment and sentence of the trial court.
On September 16, 1997, Paul Hardaway was shot and killed in his home at 436 West Evergreen in Youngstown, Ohio. Testimony at trial revealed that the evening before the crimes, Hardaway and Appellant drove to the east side of Youngstown where Hardaway robbed two individuals of five and one-half ounces of cocaine. (Tr. pp. 266-268). Hardaway and Appellant subsequently returned to Hardaway's home and began a night of alcohol and drug consumption with other friends. (Tr. pp. 268-271). Appellant testified that he left the house between 3:00 a.m. and 4:00 a.m. to see his girlfriend, Cheree Moore, and their child at 412 Cohasset, two blocks from Hardaway's house. (Tr. p. 271-273).
At trial, Gerald Hardaway (Gerald), the victim's brother, testified that Appellant later returned to Hardaway's house where Appellant and the Hardaways watched a movie in the bedroom. (Tr. p. 148-149). Hardaway fell asleep on the bed and Appellant left the room stating that he was going to sleep in a chair in another room. (Tr. p. 150). Gerald testified that out of the corner of his eye he saw Appellant re-enter the bedroom and walk to the side of the bed. (Tr. pp. 150-151). Gerald then heard gunshots and ducked under the bed because he believed shots were being fired through the window. (Tr. p. 151). When the gun shots stopped, Gerald looked up to find Appellant standing over him and pointing a gun at him, "* * * trying to shoot [him]." (Tr. p. 151). "He was trying to do something, but it would not shoot." (Tr. p. 158). Appellant told Gerald to lay face down, not to move and to give Appellant his money. (Tr. p. 151). Gerald gave Appellant money and crack cocaine and Appellant then searched through Paul's pockets as well as a dresser drawer. (Tr. p. 151-152). Appellant left the room and returned and demanded, "Where's the rest of the money and dope?" (Tr. p. 153). When Gerald stated that he didn't know, Appellant fled. (Tr. p. 153).
Appellant's testimony is somewhat different. According to Appellant, after he left the Hardaway house between 3:00 a.m. and 4:00 a.m., he stayed at his girlfriend's house for several hours. (Tr. p. 272-275). Appellant testified that he telephoned his girlfriend later that day and that she advised him that the police were looking for him as a suspect in the murder. (Tr. p. 276). Appellant fled to Columbus in an attempt to avoid arrest, but was arrested in Youngstown on March 4, 1998.
On April 3, 1998, Appellant was indicted on one count of aggravated murder with prior calculation and design in violation of R.C. § 2903.01(A)(D) with a firearm specification, one count of aggravated murder (felony murder) in violation of R.C. §2903.01 (B)(D) with a firearm specification, one count of aggravated robbery in violation of R.C. § 2911.01(A)(3)(C) with a firearm specification and one count of attempted aggravated murder in violation of R.C. § 2923.02(A)(E) with a firearm specification. Appellant was also indicted on one count of carrying a concealed weapon in violation of R.C. § 2923.12, which charge stemmed from his arrest on March 4, 1998.
Pursuant to Appellant's motion filed on May 4, 1998, the trial court granted Appellant's request to try the concealed weapon charge separately. On May 7, 1998, Appellant waived his right to a jury trial and elected to have this matter heard by the court.
On May 14, 1998, the trial court found Appellant not guilty of aggravated murder with prior calculation and design, guilty of felony murder with a firearm specification and guilty of aggravated robbery with a firearm specification. The trial court found Appellant not guilty of attempted aggravated murder but guilty of the lesser included offense of attempted murder in violation of R.C. § 2923.02 and § 2903.02 with a firearm specification.
The trial court sentenced Appellant to life imprisonment for aggravated murder plus three years mandatory incarceration on the firearms specification. On the aggravated robbery conviction, the trial court sentenced Appellant to ten years incarceration with an additional mandatory sentence of three years for the firearm specification. On the attempted murder conviction, the trial court sentenced Appellant to ten years incarceration with a mandatory three years for the firearm specification. The court ordered that the sentences for attempted murder to be served consecutively to the sentences for aggravated murder as they constituted separate and distinct crimes. However, for sentencing purposes, the trial court merged the firearm specifications on the charges of aggravated murder and aggravated robbery as they were part of the same act or transaction.
On May 27, 1998, Appellant filed his notice of appeal. His sole assignment of error alleges:
 "VIEWING THE EVIDENCE IN A LIGHT MOST FAVORABLE TO THE PROSECUTION, A RATIONAL TRIER OF FACT COULD NOT HAVE FOUND THE ELEMENTS OF MURDER PROVEN BEYOND A REASONABLE DOUBT"
Appellant argues that his murder conviction was against the manifest weight of the evidence. Appellant claims that the evidence was contradicted, uncertain, unreliable, vague and based on the self-serving testimony of an impeached witness. Appellant asks this Court to apply the reasoning of
State v. Mattison (1985), 23 Ohio App.3d 10, where the court set forth the following guidelines to consider in determining whether a verdict was against the manifest weight of the evidence: 1)whether the evidence was uncontradicted; 2)whether a witness was impeached; 3)what was not proven; 4)that the reviewing court is not required to accept the incredible as true; 5)the certainty of the evidence; 6)the reliability of the evidence; and, 7)whether a witness's testimony is self-serving and vague, uncertain or fragmentary. Id., 14. According to Appellant, every criteria is met by this case and, thus, this Court should reverse the trial court's decision.
Appellant maintains that the trial court relied on Gerald's testimony which was untrustworthy because Gerald is a confessed drug dealer who was intoxicated from smoking marijuana and consuming alcohol before the murder and because Appellant's counsel impeached him with prior inconsistent statements. Appellant contends that on direct examination and in a video-taped statement entered into evidence, Gerald was unsure of the type of gun used to commit the crimes, but that on cross examination he stated that the gun used was a nine millimeter. Appellant also argues that during his first interview following the shooting, Gerald did not mention the sale of cocaine on the evening of the shooting, but that when he testified at trial he admitted to selling cocaine. Appellant further asserts that when giving an initial statement to police and during his video-taped statement to police, Gerald failed to mention that Appellant left Paul Hardaway's house on the night in question and that Appellant returned. In addition, Appellant maintains that Gerald's testimony was impeached and self-serving because by incriminating Appellant he diverted attention from himself as a suspect.
Appellant argues that he and his girlfriend, Cheree Moore, presented consistent testimony. They testified that he left Paul Hardaway's house at approximately 3:00 a.m., went to the home of Cheree Moore, his girlfriend, and did not return to Hardaway's home. Appellant also contends that the Youngstown Police Department's investigation was inadequate and left the state unable to prove the identification of the shooter. Appellant argues that investigators failed in several respects. He claims that they should have, and did not, compare a bloody shoe print found near the victim either to Gerald or to Appellant, take fingerprints from shell casings, recover the murder weapon and that they failed to search Paul Hardaway's house.
Appellant urges that, without Gerald's testimony, he was never identified as the shooter. He claims that because of Paul Hardaway's drug related activity, many people had motives to kill him. Appellant even offers that Gerald had financial motives to kill his brother.
Based on the record before us, we find that Appellant's assignment of error is without merit and the trial court decision must be affirmed.
The issue of whether a trial court judgment is against the manifest weight of the evidence was addressed in State v.Thompkins (1997), 78 Ohio St.3d 380. The court distinguished between sufficiency of the evidence and weight of the evidence.Id., 386. "[S]ufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally insufficient to support the jury verdict as a matter of law." Id., quoting Black's Law Dictionary (6 Ed. 1990) 1433, and Crim.R. 29(A). "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law."State v. Thompkins, 386, citing State v. Robinson (1955), 162 Ohio St. 486.
Even though a reviewing court may find that the trial court decision should be upheld as to the sufficiency of the evidence, that court can still find that the decision was against the manifest weight of the evidence. State v. Thompkins, 387 citingState v. Robinson, 487.
 "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"
 State v. Thompkins, 387 quoting Black's supra, 1594.
When reviewing a trial court decision on the basis that the verdict was against the manifest weight of the evidence, a court of appeals acts as a "thirteenth juror," especially when it reviews the trial court's resolution of conflicts in testimony.State v. Thompkins, 387 citing Tibbs v. Florida, 42.
 "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction."
 State v. Thompkins, 387 quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
While Thompkins addresses a manifest weight argument in the context of a jury trial, it also sets out the standard of review for a manifest weight argument in the context of a bench trial.State v. Reed (June 23, 1998), Columbiana App. No. 96 CO 92 unreported, 3.
As reported in Thompkins, and Tibbs, supra, in order to overturn a judgment as against the manifest weight of the evidence, a reviewing court must first decide whether there was sufficient evidence to sustain a guilty verdict. A reviewing court, looking at the record in a light most favorable to the prosecution, must determine whether a rational trier of fact could have found that all elements of the crime charged were presented beyond a reasonable doubt. State v. Filiaggi (1999), 86 Ohio St.3d 230,247.
R.C. § 2903.01 provides in relevant part that:
 "(B) No person shall purposely cause the death of another . . . while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit . . . aggravated robbery or robbery.
"* * *
 "(D) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02
of the Revised Code."
R.C. 2911.01 provides in relevant part that:
 "(A) No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall do any of the following:
 "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
 "(2) Have a dangerous ordnance on or about the offender's person or under the offender's control;
 "(3) Inflict, or attempt to inflict, serious physical harm on another.
"* * *
 "(C) Whoever violates this section is guilty of aggravated robbery, a felony of the first degree.
As an initial matter, we must note that Appellant does not challenge here his convictions for aggravated robbery or attempted murder. His argument is centered solely on his conviction for aggravated murder. As to this issue, the evidence demonstrated that the victim died of several gunshot wounds. (Tr. p. 232). Appellant knew that the victim stole five and a half ounces of cocaine from other drug dealers and that there was "money coming in and out of the house." (Tr. p. 267, 272). Appellant, along with others, testified that there was a nine millimeter handgun at the victim's house on the night of the killing. (Tr. p. 290). Gerald testified that he saw Appellant come into the room where he and the victim were, several gunshots were fired and Appellant then stood over Gerald with a gun, attempting to shoot him as well. (Tr. p. 150-151). Gerald also testified that Appellant stole his money and went through the pockets of the victim. (Tr. p. 152).
Viewing the above evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Appellant killed Paul Hardaway while committing the aggravated robbery of the Hardaway brothers.State v. Filiaggi, supra, 247.
Having shown that there was sufficient evidence to sustain the charge of aggravated murder, the next step is to determine whether the conviction is supported by the weight of the evidence. Appellant asks us to consider the factors set forth in State v.Mattison, supra. Appellant correctly identifies those factors but fails to note that the Mattison court expressly stated that they are, "* * * merely guidelines to be taken into account when weighing the evidence. They are not hard and fast rules which must be followed." Id., 14. In State v. Slocum (1998), 131 Ohio App.3d 512, we acknowledged the Mattison factors but also emphasized that, "* * * the trier of fact * * * is in the best position to assess the credibility of the witnesses presented and to determine the weight to be afforded the evidence offered." Id., 520 citing State v. DeHass
(1967), 10 Ohio St.2d 230.
Appellant's first arguments center around credibility issues. Appellant first challenges Gerald's credibility based solely on the fact that he was a confessed drug dealer. (Tr. p. 44). Apparently, Appellant believes that based on this alone, his testimony as a whole should be disregarded. Appellant supplied no law to support this contention.
Appellant next asserts that Gerald testified on direct examination that he was unsure what type of gun he saw, but on cross examination he stated that the gun was a 9mm. (Tr. pp. 152, 236). Thus, Appellant claims that his testimony in this regard is completely unreliable. However, when reading Gerald's testimony in context, we do not find any glaring inconsistency that would make his credibility suspect.
The following transpired on direct examination of Gerald on May 6, 1998:
"Q. Did [Appellant] have a gun in his hand?
"A. Yes.
"Q. What kind of gun?
"A. I'm not sure.
 "Q. Do you know the difference between a revolver and an automatic?
"A. Yes.
"Q. Was it a revolver or an automatic?
"A. It was an automatic.
"Q. Do you know what color it was?
"A. It was gray, black."
(Tr. pp. 151-152).
On cross examination Gerald was asked: "Now, to be clear, you said today that you didn't know what kind of weapon he had that day; is that correct?" to which he responded, "That's correct." (Tr. p. 166). This does not conflict with his prior testimony, as he did state that he was unsure as to what type of gun was used prior to the state extrapolating more information from him as to its color and general kind.
Four days later, on May 12, 1998, Appellant re-called Gerald when he presented his defense. Appellant's counsel presented a videotaped statement made by Gerald to police shortly after his brother was murdered in an attempt to impeach his earlier testimony. Gerald then testified as follows:
 "Q. Mr. Hardaway, do you remember what kind of weapon was used in the shooting?
"A. Yes.
"Q. Did you remember that morning?
"A. Yes.
"Q. What kind of weapon is it?
"A. I think it was a 9mm.
 "Q. Do you remember testifying earlier that you did not remember or did not know what kind of weapon it was?
"A. No, I don't.
"Q. You don't remember testifying to that fact?
"A. No, I don't. I don't remember.
 "Q. Do you remember talking to the police — we showed you the tape. Do you remember what kind of weapon you represented to them it was?
"A. Yes.
"Q. And what did you tell them?
"A. I think it was a 9mm.
"Q. And that's what you said on the tape?
"A. Yes.
"Q. You're absolutely clear on that?
"A. No, I'm not.
"Q. You're not clear on that?
"A. No, I'm not, sir.
 "Q. Isn't it true that you said you didn't know what kind of gun it was?
"A. Yes.
 "Q. But now you're telling us you do know what kind of gun it was?
"A. Yes.
"* * *
"Q. Okay. The question is, are you lying now?
"A. No, I'm not.
 "Q. Then you were lying on the tape when you said you didn't know what kind of gun it was?
"A. No, I wasn't.
"Q. You weren't?
"A. No.
 "Q. When you testified earlier in the case, you testified you didn't know what kind of gun it was. Do you remember that?
"A. Yes.
"Q. And now you're saying you do know?
"A. Yes.
"Q. So you were lying earlier; is that correct?
"A. That's not correct.
 "Q. Then what was going on earlier when you said you didn't know what kind of gun it was?
"A. Because I didn't know at the time.
"Q. When did you find out?
"A. The other day.
"Q. How long ago?
"A. Around Friday.
 "Q. Friday was the first time you learned what kind of gun it was?
"A. A 9mm.
"Q. Was Friday?
"A. Yes.
 "Q. Okay. Now, who would have known what kind of gun it was that morning of the shooting?
"A. Chris.
"Q. The killer?
"A. Yes.
 "Q. The killer is the only man that would have known what kind of weapon it was that morning?
"A. And the police.
"Q. Why would the police know?
"A. From gun shells on the floor.
"Q. Okay. Would they be able to tell the color of the weapon?
"A. It was gray and black.
 "Q. Okay. And how would they know the color of the weapon by looking at the gun shells?
"A. I knew the color of the gun.
"Q. Okay. Did you know it was a 9mm?
"A. No, I did not.
"Q. So you didn't tell the police it was a 9mm?
"A. No, I did not."
(Tr. pp. 236-240).
Upon subsequent questioning by the State, Gerald again stated as he had in his prior testimony that the gun used was an automatic rather than a revolver. (Tr. p. 241). In addition, Gerald testified that police never questioned him regarding what type of gun was used. (Tr. p. 241).
It is undeniable that on his re-call to the stand, Gerald gave answers which were confusing and somewhat at odds with those he made previously at trial. However, read in the entire context, it is readily apparent that Gerald was confused by the last line of questioning. Gerald's answers during his later testimony appear to be based on what he knew at the time of his testimony. Gerald's statement to police was replayed four days prior to his being re-called as part of the defense's case, on the same day that he offered this later testimony. In the interim, there was testimony presented that the gun used to kill Paul Hardaway was a 9mm. (Tr. p. 199). It can be seen from the record that Gerald's answers that he knew the weapon used to kill his brother was a 9mm were derived from information learned subsequent to his initial testimony.
Arguably, Gerald's confused answers bring his credibility into question. However, the thorough questioning by Appellant's counsel actually served to clarify Gerald's answers and to rehabilitate him as a witness. As we have quoted, above, upon continued interrogation, it came to light that Gerald had no knowledge that the gun was a 9mm until the first day of trial. This supports the conclusion that Gerald was confused by the later questioning. Moreover, his answers that police knew the gun was a 9mm based on their finding casings at the scene and the fact that he had consistently testified as to the color of the gun confirms the conclusion that Gerald was stating that he now knew the gun was a 9mm because he had compiled information from his first-hand observation and combined this with evidence revealed during the trial. We note also that the trial court ordered the separation of witnesses. However, there is no indication on the record that Gerald was removed from the courtroom subsequent to his initial testimony and prior to his re-call to the stand.
Appellant also insists that Gerald stated on the videotaped statement that he did not know what type of weapon was used and that somehow his testimony was thereby "impeached". On cross examination by the state, however, Gerald stated that police made no inquiry into what type of gun was used. A review of the videotape entered into evidence reveals that police, in fact, posed no such questions to Gerald.
Appellant also challenges Gerald's credibility based on his testimony at trial that he sold cocaine on the evening of the murder while he made no mention of such criminal involvement in his videotaped statement to police. (Tr. pp. 143, 165). While the record reveals this omission, we must take issue with Appellant's characterization that this omission, in and of itself, affects Gerald's credibility. Realistically, the mere fact that he admits to criminal activity may impact how a trial court will review his overall credibility as a witness. However, Appellant claims that his failure to tell the police about such activity amounts to a lie. On cross examination, defense counsel questioned Gerald regarding this "inconsistency." However, on re-direct examination by the state, Appellant asserted, and this is apparent on our review of the videotape, that police never questioned him regarding drug activity. (Tr. p. 174). Because there was no contrary assertion to the police, we see nothing in these two statements that directly affects Gerald's credibility.
Appellant also challenges Gerald's testimony at trial that Appellant left Hardaway's house some time prior to the shooting when he made no mention of this during his statement to police. Appellant's characterization of this as an inconsistency is completely inaccurate. A review of the videotape clearly reveals that Gerald told police that Appellant left the house with two girls and returned later. Gerald related that Appellant said he was going to get something to drink but that he believed Appellant actually went to get a gun.
Finally, Appellant argues that Gerald Hardaway's testimony is wholly implausible and should be given no weight in light of Appellant's own testimony and the corroborating testimony of Cheree Moore. Moore began her testimony by stating that she loved and cared for Appellant. (Tr. p. 245). She testified that Appellant came to her house around 3:00 a.m. on the morning of the shooting. (Tr. pp. 246, 248). Moore stated that ten or fifteen minutes before 7:00 a.m., she and Appellant heard her grandmother stirring up-stairs and she told Appellant to hide in the basement so he would not be seen. (Tr. p. 249). Moore recounted that around 7:30 a.m. she told Appellant that he had to leave, that he did so and that she then woke her younger brother for school. (Tr. p. 250).
As noted earlier, Appellant testified that he left Paul Hardaway's house around 3:00 a.m. the morning of the murder and went to Moore's house two blocks away. (Tr. pp. 272-273). Appellant testified that when he heard Moore's grandmother coming, he hid in the basement. (Tr. p. 274). In addition, Appellant testified that when Moore woke her brother for school, Appellant went to his cousin's house at 431 West Delason Avenue where he called a cab sometime after 7:00 a.m. (Tr. p. 275). According to Appellant, he originally wanted to go to Crandall Avenue but that he then requested to be taken to Seneca Street on the north side of Youngstown. (Tr. pp. 275-276).
While in their direct testimony Appellant and Moore are generally in agreement, a review of their cross-examination reveals confusion and inconsistencies in their stories, as well. Upon questioning by the prosecutor, Moore testified that Appellant walked to his cousin's house where he called a cab. (Tr. pp. 256-257). However, Moore then stated that she first called a cab to pick up Appellant at the house next door but that she canceled the request when Appellant left the house. (Tr. p. 257). Moore reaffirmed her contention that Appellant left her house around 7:30 a.m. and when the prosecutor attempted to impeach her with information from the taxi dispatch log that indicated that a cab was dispatched to her street at 6:41 a.m., Moore denied making a call at that time. (Tr. pp. 257-258).
Upon cross examination, Appellant recalled that Moore called a cab to pick him up at Moore's neighbor's address. (Tr. pp. 293-294). However, when confronted with information that a call was made to the taxi company at 6:41 a.m., Appellant speculated that Moore may have made the call when he was hiding in the basement. (Tr. p. 294). Appellant then testified that the call was made after he heard police sirens. (Tr. pp. 294-295). However, Appellant had previously testified that he heard sirens after Moore's grandmother awakened at about 6:45 a.m. or 6:50 a.m., but before Moore went to wake her brother, which was around 7:17 a.m. (Tr. pp. 249, 294-295). Appellant stated that the first call for a taxi was canceled because Moore's grandmother was still downstairs. (Tr. p. 295). Appellant was also questioned regarding the taxi company's record that a cab was dispatched to 431 West Delason Avenue at 6:53 a.m. to take a passenger to Crandall Avenue. When asked if that could have been a reference to his call, Appellant responded, "Could have been, yes, sir, if that's my cousin's address." (Tr. p. 297).
There are inconsistencies regarding the time at which Moore called a cab for Appellant and the time at which Appellant called a cab from his cousin's house. These inconsistencies raise the question as to the actual time that Appellant left Moore's house. Moreover, Appellant's own testimony is suspect as it is indisputably self serving. Likewise, Moore's testimony is equally questionable as she admitted to loving and caring for Appellant, although she did state that she would not lie for him, "* * * not about something like this." (Tr. p. 245). Thus, even the consistent portions of the testimony of both Appellant and Moore are somewhat questionable. Appellant eluded police from September, 1997, to March, 1998. Such a time span was more than sufficient for Appellant and Moore to harmonize their stories.
Although Gerald's criminal behaviors, omissions and confusing answers about the gun does not reflect well on his credibility, it is well-settled in Ohio law that the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the fact. State v. DeHass, supra, 231. This is because the trier of fact occupies the best position for observing and assessing the demeanor of the witnesses as they testify.Myers v. Garson (1993), 66 Ohio St.3d 610, 615; Seasons Coal Co.v. Cleveland (1984), 10 Ohio St.3d 77, 80. Thus, a reviewing court will not second-guess such determinations unless it is clear that the trial court, in this instance, lost its way and a miscarriage of justice occurred.
In the matter before us, the trial court, as factfinder, was faced with testimony from all witnesses which contain some inconsistencies. Further, all of the witnesses can be seen as offering self-serving testimony, for various reasons and at least two of the witnesses, Appellant and Gerald, were intoxicated on the night in question. Certain of the evidence does reveal that the trial court had before it some cogent and coherent way to rationalize at least the three witnesses' testimony as to timing on the night of the shooting. When the testimony of Appellant and Moore is considered in light of other evidence in the record, it can be rationally inferred that Appellant left Moore's house around 6:41 a.m. and departed from his cousin's house at around 6:53 a.m. Appellant testified that Moore's house on Cohasset was two blocks from West Evergreen where the murder occurred. Appellant's cousin's home on West Delason was one block from Moore's Cohasset address. (Tr. p. 286). Based on the proximity of the streets and the time frame established by the cab dispatch log, it is plausible that Appellant left Moore's house, murdered Paul Hardaway, robbed Gerald Hardaway and then fled to his cousin's house on West Delason at which point he departed to the north side of Youngstown by cab.
Aside from the above, the trial court was essentially confronted with two versions of the events; Gerald's account, and the shared story of Appellant and his girlfriend. We must stress again that the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the fact. Statev. DeHass, supra, 231. Where there exists conflicting testimony, either of which version may be true, we may not choose which view we prefer. State v. Gore (Feb. 17, 1999), Mahoning App. No. 94 CA 97, unreported, *2. Instead, we must accede to the trier of fact, who, "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id., quoting Seasons Coal Co., Inc. v. Cleveland,supra, 80. Here, the trier of fact was faced with three witnesses, all of whom call into question his or her credibility for various reasons. The trial court, after seeing and hearing these witnesses, clearly believed Gerald Hardaway. We cannot say, based on the deference we must give to the trial court's factual determinations, that this was erroneous. Further, in light of the time frame and close proximity of the area in question, it is plausible to reconcile certain portions of all three witnesses' testimony.
In a sub-argument within Appellant's assignment of error, Appellant also challenges his conviction as against the manifest weight of the evidence based on what he describes as inadequate investigation by the Youngstown Police Department. In support of his argument, Appellant raises the following points: the police failed to investigate a bloody shoe print found at the scene by matching it to either Appellant or Gerald Hardaway. (Tr. pp. 206-207). The police did not test bullet casings found at the scene for fingerprints. (Tr. p. 208). The police did not complete a search of the house and never recovered the murder weapon. (Tr. p. 210). Finally, Appellant implies that the police failed to adequately investigate other possible suspects. Appellant argues that Paul Hardaway had numerous enemies as a result of his drug dealing. Appellant points to evidence that Hardaway robbed two individuals of their drugs and money on the day prior to his murder. (Tr. pp. 267-268). Appellant even states that Gerald had a financial motive to kill his brother.
In State v. Slocum, supra, the appellant was convicted of complicity to commit murder and complicity to commit attempted murder. Challenging his convictions as against the manifest weight of the evidence, the appellant claimed that the evidence supported that the victim was not killed by bullets fired by his accomplice, but by "friendly fire" coming from others within decedent's house. We wrote:
 "While appellant's "friendly fire" theory is certainly compelling, it is only a theory. Appellee provided a substantial amount of evidence that points to [the accomplice] as the shooter of the fatal shot. The trier-of-fact was entitled to weigh the facts and theories presented. This court will not disturb the trier-of-fact's determinations when the trier-of-fact chooses to value substantial credible evidence rather than a theory, no matter how compelling that theory may be. Therefore, appellant's conviction was not against the manifest weight of the evidence * * *."
 Id., 521.
In the present matter, the state not only presented all of the evidence discussed earlier, but also presented Appellant's admission that he fled to Columbus, Ohio, upon learning that police had named him as a suspect in the murder. (Tr. pp. 276-278). Furthermore, Appellant admitted attempting to elude arrest on March 4, 1998. Appellant stated that when police came to the front door of the house where he was staying, he immediately went to the back door, discovered police had surrounded the house and then retreated upstairs. (Tr. p. 279). When Appellant looked out of the window and saw police surrounding the house, he admits he then hid in a closet. (Tr. p. 279).
The Ohio Supreme Court has stated:
 "It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself."
 State v. Williams (1997), 79 Ohio St.3d 1, 11 quoting Statev. Eaton (1969), 19 Ohio St.2d 145, 160, vacated on other grounds (1972), 408 U.S. 935, quoting 2 Wigmore, Evidence (3 Ed.) 111, Section 276.
Considering the record as a whole, we cannot conclude that Appellant's conviction is against the manifest weight of the evidence. Although Gerald's testimony presented some inconsistencies, they were not so great as to destroy his credibility, which, as we have stressed repeatedly, is a matter for the trier of fact to resolve. Deferring to the trial court on matters of credibility, we do not find from the record that it created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins,supra, 387.
For all the forgoing reasons, Appellant's assignment of error is without merit and we affirm the conviction and sentence of the trial court.
DONOFRIO, J., VUKOVICH, J., concurs.