THE STATE OF OHIO, APPELLEE, *v.* EATON, APPELLANT.

(No. 69-208—Decided July 30, 1969.)

*Mr. Melvin S. Rueger,* prosecuting attorney, *Mr. Calvin W. Prem* and *Mr. Carl W. Vollman,* for appellee.

*Mr. Harry H. McIlwain* and *Mr. Robert O. Smith,* for appellant.

GRAY, J.* In his brief, defendant sets forth the following assignments of error:

1. The trial court erred in not excluding a prospective juror, challenged for cause, when said juror said on the *voir dire* that the defendant was guilty.

2. The trial court erred in excusing certain prospective jurors who said they were opposed to capital punishment but could join in a verdict resulting in the death penalty if there was justification from the evidence.

3. The trial court erred in admitting evidence of a prior hold-up allegedly committed by the defendant, which did not have probative value in the case on trial.

4. The trial court erred in forcing the defendant to testify by refusing to charge the jury on manslaughter unless he took the witness stand, even though there was ample evidence in the state's case to support a charge to the jury on manslaughter.

5. The trial court erred in admitting into evidence defendant's confessions, where the defendant was not furnished a lawyer and did not knowingly and intelligently waive his privilege against self-incrimination.

6. The trial court erred in permitting improper evidence, already ruled out by the court, read into evidence by the prosecution.

7. The trial court erred in not charging the jury immediately upon conclusion of closing arguments.

8. The trial court erred in its general charge to the jury on the element of intent by not including testimony as evidence of intent.

9. The trial court erred in its charge to the jury on recommending mercy by not explaining "mercy" as it is commonly used.

---

*Because of the inability, "by reason of illness," of JUSTICE CHARLES B. ZIMMERMAN "to hear, consider and decide" this cause, JUDGE GRAY of the Fourth Appellate District was, pursuant to Section 2 of Article IV of the Constitution of Ohio, duly directed by the Chief Justice "to sit with the justices of the Supreme Court in the place and stead of" JUSTICE ZIMMERMAN, and JUDGE GRAY did so and heard and considered this cause prior to the decease of JUSTICE ZIMMERMAN on June 5, 1969.

### Assignment of Error No. 1.

The gist of defendant's complaint is that he was forced to use a peremptory challenge in excusing Mrs. Marion B. Woodley from the jury.

The record shows that defendant used five peremptory challenges. By statute, he was entitled to six.

A party cannot complain of prejudicial error in the overruling of a challenge for cause if it does not force him to exhaust his peremptory challenges.

If there was error, as claimed by defendant, in the trial court's ruling on this challenge for cause, it is deemed waived by the acceptance of the jury where the number of peremptory challenges remains unexhausted. *Mimms* v. *State,* 16 Ohio St. 221; *Erwin* v. *State,* 29 Ohio St. 186; *Hopt* v. *Utah,* 120 U. S. 430.

The record shows that defense counsel stated that they were satisfied with the jury immediately before it was sworn.

### Assignment of Error No. 2.

In this assignment of error, defendant complains that Mrs. Artie L. Craig was erroneously excused as a juror on a challenge for cause. Defendant maintains that the trial court committed prejudicial error in sustaining the prosecution's challenge for cause because a death-minded jury was produced thereby.

In this assignment of error defendant complains that the prosecution succeeded in securing a death-minded jury in that it systematically excluded, either based on challenge for cause or on peremptory challenge, all prospective jurors who had announced any difficulty in accepting the philosophy of capital punishment.

The challenges for cause do not show such a systematic plan. Defendant is attempting to extend the concepts of *Witherspoon* v. *Illinois,* 391 U. S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, to ban the use of peremptory challenges by the prosecution to excuse from the jury anyone who did not believe in the death penalty. Ours is an adversary system of jurisprudence. To carry defendant's contention to its logical conclusion we would be required to eliminate

peremptory challenges from our judicial procedure.

A peremptory challenge is an arbitrary species of challenge to a certain number of jurors without showing any cause. The right to peremptory challenges, given by the law of Ohio, is absolute and cannot be questioned by opposing counsel or the court, nor can it be denied to either party.

Twelve of the panel of prospective jurors were seated. Eleven were peremptorily challenged, six by the state and five by the defense. Four prospective jurors were excused on challenge for cause because they were unalterably opposed to the death penalty and no amount of evidence would change that state of mind.[1] One juror had read

---

[1]Mrs. Neal, Prospective Juror No. 10.

"Q. Now let's suppose that you have found this defendant guilty; couldn't you have an open mind on whether or not he should be sentenced to die in the electric chair? In other words, suppose the facts in this case were of such terrible nature, any reasonable person could come to no other conclusion that this should be the penalty, and everyone else on the jury came to that conclusion, could you join them, could you put—A. No, I could not.

"Q. You couldn't put aside your personal conviction. A. No.

"Q. In other words, in this case, no matter what the testimony is—A. I could not say death.

"Q. You could not, in any manner or means, vote to commit this defendant to the electric chair? A. I could not say death.

"The Court: The challenge will be sustained. The juror will be dismissed.

"(Thereupon, prospective juror No. 10, Elizabeth M. Neal, was excused for cause.)"

Mrs. Willis, prospective juror No. 11.

"Q. One of the forms of punishment upon conviction of murder in the first degree in the state of Ohio is death by electrocution, commonly referred to as capital punishment. Are you opposed to capital punishment as a form of punishment? A. Yes, I am.

"Q. How long have you had this opposition, Mrs. Willis? A. Always, I guess.

"Q. Let me ask you this: Under any circumstances, providing the assumption the state of Ohio would satisfy you of a proper case of murder in the first degree, could you join with your fellow members of the jury panel and vote a guilty verdict, knowing your verdict would result in the death of this man in the electric chair? A. No.

"Q. Under no circumstances could you do it? A. No.

"* * *

about the case in the newspaper and had thereby formed an opinion that he could not dispel from his mind.

Another juror knew the victim's mother. She was excused for cause. Another juror was excused because she did not live in the county.

There was no pattern in the rejection or selection of the members of the jury. We do not believe that the empanelling of this jury violated the rules laid down in *Witherspoon, supra.*

---

"The Court: And under no circumstances, regardless of how atrocious a case would be, could you set that opinion of yours aside and join in with the rest of the jurors in finding the defendant guilty, knowing that may mean the infliction of the death penalty.

"Prospective Juror No. 11: (Mrs. Willis) No.

"The Court: You are definite about that?

"Prospective Juror No. 11: (Mrs. Willis) Yes.

"The Court: Would you care to examine her, Mr. Smith?

"Mr. Smith: I would like to ask a couple of questions, if the Court please.

"The Court: Very well.

"* * *

"Q. Well, I am talking about the point, assuming you are selected on the jury and the jury has found the defendant guilty, then it is up to the jury to determine whether they should recommend mercy or not, and my question now is, at that point could you, depending on what the evidence was in this case, if you felt the evidence warranted it, could you join in a verdict that did not recommend mercy? A. No.

"Q. You could not? A No.

"Q. You are positive of that? A. Yes.

"Mr. Smith: That is all.

"The Court: All right, the challenge will be sustained.

"(Thereupon, prospective juror No. 11, Jean E. Willis, was excused for cause.)"

Mrs. Roll, Prospective juror No. 1.

"Q. Well, now, then, if you would be selected to serve on this jury and if the state of Ohio were to prove to you a proper case of murder in the first degree, do I understand you correctly in saying that you could not join with the other members and return a guilty verdict, knowing that his life would be taken in the electric chair? A. I could not. .

"Q. Under no circumstances could you do that? A. I am afraid my sympathy would overrule my judgment.

"Q. And you could not, under any circumstances, vote guilty, knowing that his life would be taken? A. No.

"* * *

In brief, *Witherspoon* holds:

A defendant would be deprived of his life without due process of law by the execution of the death sentence imposed by a jury from which veniremen were excluded who (1) voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction, or (2) indicated that there are some kinds of cases in which they would refuse to recommend capital punishment.

The most that can be demanded of a venireman in a

---

"The Court: And you have had that belief of long standing?

"Prospective juror No. 1: (Mrs. Roll) Yes, sir.

"The Court: And regardless of how atrocious a crime may be?

"Prospective juror No. 1: (Mrs. Roll) I couldn't.

"The Court: Regardless?

"Prospective juror No. 1: (Mrs. Roll) No.

"The Court: You couldn't do it?

"Prospective juror No. 1: (Mrs. Roll) No.

"The Court: And under no circumstances then, as I have said, may be—

"Prospective juror No. 1: (Mrs Roll) I couldn't agree to take a life.

"The Court: What?

"Prospective juror No. 1: (Mrs. Roll) I couldn't agree to take a life.

"The Court: Regardless of the nature of the offense with which a defendant may be charged?

"Prospective juror No. 1: (Mrs. Roll) No, sir."

Prospective juror No. 4—Mrs. Craig.

"Prospective juror No. 4: (Mrs. Craig) I am still opposed to capital punishment. That is the way I feel.

"The Court: And regardless, you said just a moment ago, regardless of the fact, and if the facts in the case would justify the infliction of the death penalty, you would not talk it over with the rest of the jurors and you would not change your mind under any circumstances and you would still be opposed to capital punishment, even though the evidence would justify the infliction of that penalty?

"Prospective juror No. 4 (Mrs. Craig) That's right, your Honor. Personally, I don't believe in it. I never felt it was fair.

"The Court: You just simply are unalterably opposed to capital punishment, regardless of what the evidence may be?

"Prospective juror No. 4 (Mrs. Craig) Yes, sir, that is the way I feel. I feel there are other means of punishment other than the death penalty."

capital case is that he be willing to consider all the penalties provided by law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.

ASSIGNMENT of ERROR No. 3.

The trial court permitted the prosecution to introduce evidence of an armed robbery by defendant of a Boron service station in Newport, Kentucky, on November 12, 1967.

The gist of defendant's contention in this assignment of error is that, in the Newport robbery, the station attendant was not killed, although the same plan was used to accomplish that robbery.

McNay, the attendant, was permitted to testify that defendant walked over to him, took his gun out and cocked it and relieved the attendant of his money and left.

Zimmerman, J., speaking for this court in *State* v. *Moore*, 149 Ohio St. 226, 229, wherein the court construed Section 13444-19, General Code (now Section 2945.59, Revised Code), said:

"Such section, permitting the introduction of evidence of 'like acts or other acts' committed by a defendant, to show an intent or motive for committing the offense with which he is charged, is declaratory of the common law, perhaps in a broader form. To be admissible, testimony offered under the statute must show acts so related to the offense for which a defendant is on trial that they have a logical connection therewith and may reasonably disclose a motive or purpose for the commission of such offense."

We are of the opinion that, under the test laid down therein, the testimony introduced into evidence in this case was proper and relevant.

Defendant contends further that in the opening statement on his behalf by his counsel it was admitted that defendant participated in the holdup of the Tressler Comet Station. By reason of such admission, defendant contends that the testimony of McNay was calculated to produce a prejudiced mental attitude on the part of the jury. We

do not believe that defendant has the right to limit the production of proper evidence on the part of the prosecution to any greater extent than the prosecution has the right to limit the production of proper evidence on the part of the defense. We are of the opinion that either party has the right to conduct its side of the case in the manner it deems best under the proper supervision of the trial court and the applicable statute and case law of Ohio. There is nothing in Section 2945.59, Revised Code, which requires the result contended by defendant.

There was no prejudicial error here.

ASSIGNMENT of ERROR No. 4.

The record is barren as to what transpired between counsel and the court during the time this alleged error is claimed to have occurred. The only evidence before the court was that defendant purposely killed Rodney Dale Hummel in the course of an armed robbery, which, by statute, is murder in the first degree.

Defendant requested that the court charge the jury on the crime of manslaughter. At this point, there was no evidence before the jury that would permit the court to charge on that offense. Defendant was either guilty of murder or he was not guilty.

The court, in *State* v. *Robinson*, 161 Ohio St. 213, said:

"Where the fact of killing is proved, malice is to be presumed, and all the circumstances of justification, excuse, or extenuation must be made by the accused, unless they appear from the evidence adduced against him."

It is obvious, from the record, that defendant was desirous of securing a manslaughter verdict.

Defendant could have preserved this question without taking the witness stand. Evidently he calculated that he could preserve the question, take the stand and introduce his testimony into the record, thereby enhancing his chances of securing a manslaughter verdict, his announced goal. See *State* v. *Crampton*, 18 Ohio St. 2d 182, 186, for treatment of this subject matter by Taft, C. J.

If there were extenuating circumstances, justification or excuse for the commission of the homicide which he

wished to introduce into evidence, defendant would be the only one to do it. The only other witness who had knowledge of the whole transaction was dead. The circumstantial evidence surrounding the killing and the testimony of the other living eye witness would not help him one whit.

We think that, in this instance, the trial court was benevolent toward defendant in advising him of its intentions in regard to the content of the general charge. If the trial court had not previously advised defendant that it intended to submit two verdict forms to the jury, i. e., that of first degree murder and that of not guilty, defendant would not have had the verdict form of manslaughter submitted to the jury and thus would have gambled for all or nothing. He preserved his question for the appellate courts, secured the submission of the offense of manslaughter to the jury and thereby put himself in the best possible position under the facts in this case.

ASSIGNMENT of ERROR No. 5.

Defendant contends that he was not given the *Miranda* warnings.[3]

[3]During defendant's *voir dire* cross-examination on the question whether the *Miranda* rules were observed or not, defendant testified to the following facts:

"Q. Then following the reading of your rights from that did anybody read it to you. A. You mean this paper?

"Q. Yes. A. I don't remember. I know I read it myself.

"Q. You read it. You knew what it said? A. Yes.

"Q. Did you already know what that paper contained before you read that one? A. No everything that was on it. I knew what the principle of the thing was. I knew what it was for.

"Q. You knew you had a right to a lawyer, didn't you? A. Yes, sir.

"Q. And that if you couldn't afford one, they would appoint one for you? A. Yes, sir.

"Q. Had you heard that before? A. Yes, sir.

"Q. You knew that you didn't have to tell the police anything if you didn't want to? A. Yes, I knew that.

"Q. And they couldn't make you tell them anything? A. Yes, sir.

"Q. And even if you started talking to them and didn't want to go ahead and finish what you started saying, they couldn't make you finish? You knew that, didn't you. A. Yes, I knew they couldn't make me.

He was arrested in Kentucky by the Kentucky State Police and F. B. I. agents on December 10, 1967, and lodged in the Bell County jail at Pineville, Kentucky, where he was visited by detectives Kersker and Rutledge of the Cincinnati police department on December 13, 1967.

They arrived at about 11:30 a. m., and upon learning that defendant would be having lunch soon, told him that they would visit him later.

They returned after lunch. Kersker testified that he then gave defendant the *Miranda* warnings and explained his constitutional rights to him.

Kersker told defendant that Carl Williams, his co-defendant, was in jail and had made a statement implicating defendant in the case, and that if defendant wanted to hear what Williams had told them, he was willing to tell defendant.

Defendant indicated that he would like to hear it. Kersker related to Eaton what Williams had said. Eaton did not make any statement to the detectives until after the detective had finished stating the Williams version. Eaton then said that the Williams version of the events at the Comet service station were "just about correct, just about the way it happened."

In *Miranda* v. *Arizona*, 384 U. S. 436, 478, the court said:

"In dealing with the statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element of law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege

---

"Q. You also knew if you did tell them anything, it could be used for or against you if you ever came to trial? A. Yes, sir.

"Q. You knew that back in Pineville, didn't you? A. I was pretty certain of it, yes.

"Q. Even though the FBI man that took you into custody, you knew that down there? A. Yes.

"Q. If detective Kersker forgot to tell you what your constitutional rights were, you already knew it when you met didn't you? A. Yes, sir."

while an individual is in custody is not whether he is allowed to talk to the police without benefit of warning and counsel, but whether he can be interrogated.''

ASSIGNMENT of ERROR No. 6.

Defendant maintains that prejudicial error was committed when two questions were read to the jury by the prosecution which were contained in a deposition of one Billy Cox.[3] Objections were taken by defendant to both of these questions, and the objections were sustained. However, defendant still contends that prejudicial error occurred, in that the court did not admonish the jury to disregard the inference of the answers that might be contained in the challenged questions.

We do not know what the answer was, as it is not in the record. The answer might have been favorable, noncommittal or damaging to defendant. Defendant did nothing more than object to the question. If he had a further question to present to the court, he did not at that time preserve it. Hence he waived it.

In any event, in his opening statement, defendant's counsel admitted the killing, so this question is now moot.

---

[3]"Q. Let me ask you if you recall my talking with you about a month ago at the Eddyville Penitentiary here and if, on that occasion, you didn't tell me that Eaton and Carl came in and Eaton told you that he had just killed a man, and he dropped an empty cartridge out of the gun and threw it on the bed with you and told you that if you ratted on him he would kill you?

"Mr. McIlwain: Objection.

"The Court: I will sustain the objection.

"* * *

"Q. Let me ask you this: On the 15th day of November, 1967, at 4:15 in the afternoon, while detective Kersker of the Cincinnati Police Department was interviewing you down at the crime bureau at City Hall, in the presence of Carl Douglas Williams, did you tell detective Kersker that, 'At about around 2:00 or 3:00 in the morning, something like that, Eaton and Carl came home. Eaton told me that he just killed a man. He dumped the empty cartridge out of the gun and threw it on the bed with me. He told me that if I ratted on him he would kill me.'

"Did you make that statement to detective Kersker on that date?

"Mr. Prem: Mr. McIlwain objected to that.

"The Court: Sustained."

Further, we believe that this question has been answered by the United States Supreme Court in *Namet* v. *United States*, 373 U. S. 179, 83 S. Ct. 1151. The holding of the court, as epitomized by the first paragraph of the headnotes, as reported in 83 S. Ct. 1151, is as follows:

"Where, on date of trial, two parties charged changed their pleas to guilty and they were subpoenaed to appear at the trial, prosecutor's asking those witnesses incriminating questions concerning their relationship with the defendant, with claimed knowledged that they would invoke their privilege against self-incrimination, was not misconduct or reversible error under the circumstances."

ASSIGNMENT of ERROR No. 7.

In this assignment of error, defendant claims that there was a 25-minute recess between the time counsel finished their closing arguments and the time the court charged the jury.

Section 2945.10, Revised Code, states in pertinent part:

"(G) The court, after the argument is concluded and before proceeding with other business, shall forthwith charge the jury."

The record shows that the court did not proceed with any *other* business after argument of counsel. In the trial of any case, it is frequently necessary for the trial judge to call for a recess, and so it was here.

ASSIGNMENT of ERROR No. 8.

The jury was instructed in regard to the element of intent to consider "the facts and circumstances" under which the act was done and to consider the type of weapon used in committing the homicide.

It is the contention of defendant that the jury should have been instructed in specific language that it should also consider "the defendant's mental expression that he had no intent to kill."

Of necessity, the court's charge had to be general, because most of the evidence is in conflict on this point. However, it is admitted by defendant that a gun was used in the commission of the homicide, which made this item

of evidence uncontroverted. Therefore, the court properly charged on the use of the gun in the commission of the homicide.

However, the intent, if any, with which defendant committed the act is in dispute. The fact that the court did not specifically charge the jury that, from the facts adduced, the jury should assume as a proven fact that it was "defendant's mental expression that he had no intent to kill" was not error. If it had done otherwise, the trial court would have invaded the province of the jury.

We are of the opinion that the intent with which defendant committed the homicide was properly presented to the jury in the court's charge.

In defendant's brief it is stated:

"It should be remembered in this case that the defendant admitted the attempted robbery, that Mr. Hummel was killed and that the death occurred in the course of unlawful acts of the defendant."

Defendant contends that the victim was shot during a scuffle. He did not say where Hummel was shot, but he did say that Hummel was shot while they both were scuffling and there is a strong inference that they were facing each other at the time the shot was fired. The uncontroverted medical fact is that Hummel was shot in the back by a gun held at least a foot from his back. For Hummel to have been shot in the manner described by defendant would have been very difficult, if not impossible.

The use of the deadly instrument, supported by the uncontroverted medical facts and the testimony of Raines, concerning the chase supplied the elements of malice and intent. A person intends the natural and probable consequences of his acts.

In paragraph one of the syllabus in *State* v. *Huffman*, 131 Ohio St. 27, it is stated that "* * * if a statute defining an offense is silent on the question of intent, it is not necessary to allege and prove an intent to commit the offense."

Section 2901.06, Revised Code, defines manslaughter,

as follows: "No person shall unlawfully kill another."

It is obvious that intent is not an element of the offense of manslaughter, as defined by Section 2901.06, Revised Code, as construed in *State* v. *Huffman, supra.*

The facts of record show that defendant fled from the scene of the homicide without attempting to aid the person whom he claims was accidentally killed.

His flight from the scene of the homicide tended to disprove defendant's claim that the homicide was an accident.

"Flight from justice, and its analogous conduct, have always been indicative of a consciousness of guilt. * * *"

"It is to-day universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." 2 Wigmore on Evidence (3 Ed.), 111, Section 276, and cases cited.

ASSIGNMENT of ERROR No. 9.

Defendant claims that he was prejudiced by the fact that the court did not define mercy in the commonly accepted manner. We are of the opinion that the trial court was even-handed in its charge to the jury on the question of mercy. No doubt defendant is complaining about the fact that the trial judge charged the jury as to what mercy was and what it was not. We think that this approach was proper.[4]

The possible penalties and the effect of mercy on the jury's verdict were thoroughly gone into on the *voir dire* during the empanelling of the jury.

After the completion of the general charge, the follow-

---

[4]The pertinent part of the charge to the jury on this issue reads:

"If you find the defendant guilty of murder in the first degree, you must determine whether or not you will extend mercy. This matter is solely within your discretion, and it requires the exercise of your most profound judgment. You must not be motivated by sympathy or prejudice, or as a means of escaping a disagreeable duty. The issue of mercy must be resolved in the light of all the facts and circumstances of the case with respect to the crime and the circumstances surrounding this defendant as disclosed by the evidence."

ing colloquy occurred between the court and defense counsel:

"The Court: Does counsel for the defendant have anything to add to the court's charge?

"Mr. McIlwain: No sir."

In *State* v. *Karayians*, 108 Ohio St. 505, at page 511, Judge Edward S. Matthias, speaking for the court, said:

"It is clear to every mind that a recommendation of mercy presupposes a finding that clemency should be extended, and that some degree of leniency ought to be allowed—that the extreme penalty of the law be not inflicted. Therefore, where a jury have, as this jury did have, the court's instruction that they are authorized to recommend mercy, and that instruction is unaccompanied by any restriction or limitation whatever upon their discretion to make such recommendation, and the jury refuse to make it, the conclusion is irresistible that the jury found the case to be one in which leniency or clemency should not be extended."

It is apparent from a thorough study of the record that this case was tried by able and experienced advocates. The issues were sharply defined and were fully presented to the jury. No prejudicial error intervened. Defendant received a fair trial, and, therefore, the judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

TAFT, C. J., MATTHIAS, HERBERT and DUNCAN, JJ., concur.

O'NEILL, J., concurs in paragraphs one, two, five and six of the syllabus, and in the judgment.

SCHNEIDER, J., concurs in the syllabus but dissents from the judgment.

It was never conclusively established that prospective juror Craig (who was excused for cause) would have been prevented by her bona fide opposition to capital punishment, from returning a verdict of guilty in this case, without a recommendation of mercy. This is required by *Witherspoon* v. *Illinois*,