DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Eddie Lamont White, appeals his conviction of the offense of murder, a violation of R.C. 2903.02(A) and 2929.02, with a firearm specification, a violation of R.C. 2941.145. The conviction is based on a guilty verdict in a jury trial conducted in the Lucas County Court of Common Pleas. The jury verdict was returned on October 26, 2006. The trial court imposed sentence on November 1, 2006, of life *Page 2 
imprisonment with eligibility for parole after 15 years for the murder conviction and an additional sentence of three years imprisonment for the firearm specification. The sentence on the firearm specification is mandatory and runs consecutive to the sentence for murder.
 {¶ 2} Appellant assigns six errors on appeal:
 {¶ 3} "Assignment of Error I: The trial court's verdict was against the manifest weight of the evidence because the state's witnesses were lacking in credibility, and there was no credible corroborative evidence to link White, who had no motive, to the homicide.
 {¶ 4} "Assignment of Error II: The trial court erred by not granting White's Rule 29 motion for judgment of acquittal because they failed to prove, as a matter of law, that White acted purposely.
 {¶ 5} "Assignment of Error III: The trial court abused its discretion when it gave the jury a flight instruction.
 {¶ 6} "Assignment of Error IV: The trial court erred when it did not grant White's motion to suppress the photo arrays because the photograph of White was unduly suggestive.
 {¶ 7} "Assignment of Error V: The trial attorney provided ineffective assistance of counsel thereby denying White the right to a fair trial.
 {¶ 8} "Assignment of Error VI: Because the jury was not provided with instructions for involuntary manslaughter, reckless homicide, and negligent homicide, plain error occurred." *Page 3 
 {¶ 9} On April 3, 2006, Jermaine Middlebrooks was shot to death while on the sidewalk in front of The Ozone, a nightclub on Lagrange Street in Toledo, Ohio. The undisputed testimony of the deputy coroner was that Middlebrooks was shot in the back. He was shot with a single .40 caliber bullet. Many patrons and at least one employee of The Ozone witnessed different aspects of the incident.
 {¶ 10} Jose Montalvo headed security at the club. He testified that he witnessed White and Otha Randall approach the victim outside the club and, at the time of the shooting, that Randall faced the victim from the front. While Randall and the victim stood speaking, Montalvo saw White come up from behind the victim and shoot the victim in the back. Montalvo then heard a loud noise and saw the victim fall back.
 {¶ 11} Montalvo testified that he had seen White before that night. White had patronized the nightclub during the year before the incident for a total of five to ten times. Montalvo testified to "no doubt" that White was the individual who shot Middlebrooks. He also testified he had a clear, unobstructed view of the shooting.
 {¶ 12} Samuel Walker also testified at trial. Walker testified that the victim, Middlebrooks, was a friend, since childhood. Brenda Walker is his cousin. Theresa Randall is married to Otha Randall and also is a cousin. All were present at the club that night. Others present included Samuel Walker's fiancée (Linda Griswold), Walker's brother (Ethan Walker) and his nephew (Antwuan Walker). Samuel Walker saw Otha Randall and White at the club. He did not know White personally, but knew of him.
 {¶ 13} Samuel Walker testified that he saw Otha Randall and White outside the club approach Middlebrooks from across the street. Randall stood in front of *Page 4 
Middlebrooks and White, behind. Walker heard a gunshot. He did not know if anyone was injured, but then saw Middlebrooks on the ground in front of him. He also saw his brother, Ethan, "take off after Randall and White. He did not see anyone shoot anyone.
 {¶ 14} Samuel Walker chased his brother for the stated reason of stopping him from also getting harmed. While in the chase, he saw White gesture as if he were going to pull a weapon. Samuel Walker testified that he could see a gun under White's shirt as he gestured. He also testified that White stated "he couldn't believe that Otha had got him into some bullshit like this knowing all those man's people was out there."
 {¶ 15} Linda Griswold testified that she accompanied her fiancé, Samuel Walker, to the club. She recalled going outside the bar with Samuel Walker, Theresa Randall, Ethan Walker, and Antwuan Walker. They stood outside waiting for Brenda Walker and Jermaine Middlebrooks to come out. After Brenda and Jermaine came out, she noticed White and Otha Randall walking across the street towards the bar.
 {¶ 16} According to Griswold, at the time of the shooting, Otha Randall stood in front of Middlebrooks. White stood at Middlebrooks' back. Griswold testified that she saw White's arm and body jerk and heard a pop. Ethan Walker grabbed White. "They sort of like tussled on across Lagrange Street back to Baker Street." Griswold saw Samuel Walker, Antwuan Walker, Theresa Randall and Brenda Walker all go after Ethan Walker. Griswold stayed with the victim.
 {¶ 17} Griswold was unable to identify White in a photo array she reviewed with police within hours of the shooting. She had not seen White prior to that night. The people she was with knew him by name and called out his name as they grabbed at him *Page 5 
after the shooting. Griswold made an in-court identification of White at trial. She testified that she was unable to identify White on the night of the shooting from a police photo array but later saw White on the television news and, in a flash, recognized him as the individual who walked behind Middlebrooks.
 {¶ 18} Theresa Randall testified that she is married to Otha Randall and that she was outside the bar when the shooting occurred. She testified that Middlebrooks walked outside from the club. She saw her husband, Otha Randall, walk towards Middlebrooks, and White walk behind Middlebrooks. She testified that she stood between her husband and the victim, as Otha Randall faced the victim. She then heard a gun go off, turned around, and saw Middlebrooks fall.
 {¶ 19} She had met White before that night, approximately three times. She identified White when presented with the photo array.
 {¶ 20} Antwuan Walker testified that he went to the bar with his uncle, Ethan Walker. As he left the bar, he heard Middlebrooks behind him, talking. He testified he heard a gunshot, ducked, and then saw White "tucking the gun in his stomach." He saw his one uncle running across the street and the other chasing him.
 {¶ 21} Later, according to Antwuan Walker, White pulled a pistol out from his waist and told them to get back. Otha Randall had been yelling to those pursuing them, "you all get back, you all don't know what you're getting yourself into, and he kept repeating that."
 {¶ 22} Antwuan Walker identified White at trial. He testified that had seen White often before the shooting. He saw Otha Randall and White leave in the same car. *Page 6 
Antwuan Walker has a felony record for three drug trafficking convictions and a conviction for tampering with evidence.
 {¶ 23} Otha Randall also testified. He testified that his wife was at the bar but that he had not wanted her there. He was interested in other women at the bar. According to Randall, as he and his wife walked out of the club, he tried to stir up an argument so they would leave separately. Middlebrooks injected himself into the conversation between Randall and his wife outside the club. While Randall spoke to Middlebrooks, White "pulled something." There was a "boom" and Middlebrooks fell down. Randall testified that his wife's family members chased after White. Randall also testified that he followed and saw White pull out a gun after the shooting.
 {¶ 24} Randall entered a plea agreement with the state providing for a conviction for a reduced charge of involuntary manslaughter for the shooting and an agreement to drop a drug possession charge.
 {¶ 25} Nicole Crumby testified that White came unannounced to her residence on the morning after the shooting. He told her nothing about a shooting. Police came to her residence. Sergeant Tim Noble of the Toledo Police Department testified that White was hiding in an upstairs closet at the Crumby residence when he was apprehended by police.
 {¶ 26} Jeronica Phillips was incarcerated with White at the Lucas County jail for a period after the shooting. Phillips was serving a four year sentence for a burglary conviction at the time he testified. Phillips was convicted of felonious assault in 1993, and robbery in 2005. *Page 7 
 {¶ 27} Phillips testified that White told him in April 2006, that he had words with the victim at the bar, left the bar, came back and shot him. He said he used a .40 caliber gun. Phillips also testified that White identified the bar as The Ozone and that Otha Randall had picked him up.
 {¶ 28} Phillips testified that White had informed others at the penitentiary that Phillips was a "snitch." According to Phillips, White has told him "that he was going to kill me or have me killed."
 {¶ 29} Dr. Cynthia Beisser is a deputy coroner of the Lucas County Coroner's Office. Dr. Beisser performed an autopsy on Jermaine Middlebrooks. The examination disclosed that Middlebrooks suffered a through and through gunshot wound. The entrance wound was in the lower right side of the back. The exit wound was in the left side of the abdomen in the front. The wound track was from right to left. The deputy coroner also testified that Middlebrooks died from the gunshot wound.
 {¶ 30} The deputy coroner was unable to determine the distance the gun was from the body when fired. She testified that the minimum distance was 6 to 8 inches and up to 12 inches from the victim's body, depending on the weapon used. The weapon was not identified at trial. Neither the gun nor bullet was recovered from the scene.
 {¶ 31} In the first two assignments of error, appellant contends that the jury verdict was against the manifest weight of the evidence and that there was insufficient evidence to prove that he committed murder. The Ohio Supreme Court has recognized that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins,78 Ohio St.3d 380, 386, *Page 8 1997-Ohio-52. "Sufficiency" concerns a question of law on whether the evidence at trial is legally adequate to support a jury verdict as to all elements of a crime. Id. The Ohio Supreme Court in State v.Jenks (1991), 61 Ohio St.3d 259 identified the required analysis to determine whether there was sufficient evidence to support a conviction:
 {¶ 32} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979],443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)" State v.Jenks, paragraph two of syllabus.
 {¶ 33} In appellate review of a judgment under the manifest weight of the evidence standard, however, the function of appellate courts is different. The court acts as a "thirteenth juror," reweighs the evidence, and may disagree with a factfinder's conclusions on conflicting testimony. Thompkins at 387; State v. Lee, 6th Dist. No. L-06-1384, 2008-Ohio-253, ¶ 12. "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins at 387, quoting with approval, State v.Martin (1983), 20 Ohio App.3d 172, 175. *Page 9 
 Sufficiency of the Evidence {¶ 34} We consider the sufficiency of the evidence issue first. Appellant was convicted of murder in violation of R.C. 2903.02(A) and2929.02 with a firearm specification in violation of R.C. 2941.145. R.C. 2903.02(A) provides: "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy."
 {¶ 35} R.C. 2929.02 provides for penalties for murder, including penalties for violations of R.C. 2903.02. R.C. 2941.145 is the firearm specification statute. It provides for the imposition of a three-year mandatory prison term where "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A).
 {¶ 36} Appellant argues that there was insufficient evidence to establish the element of murder under R.C. 2903.02 that he "purposely" caused Middlebrooks' death. He claims that the evidence, at best, provides proof of recklessness or negligence.
 {¶ 37} The undisputed testimony from the deputy coroner was that Middlebrooks was shot in the back and that the injury from the shooting caused his death. There was eyewitness testimony by witnesses who saw appellant shoot Middlebrooks in the back. There was eyewitness testimony by others who saw that appellant was directly behind Middlebrooks when a gunshot was heard and the victim fell to the ground. A state prisoner testified that appellant admitted the killing while he and appellant were both inmates at the Lucas County jail. *Page 10 
 {¶ 38} Middlebrooks was shot in the back with the entrance wound in the lower right side of the back and exit wound in the left side of the abdomen in the front. White was in close proximity, behind the victim when the shooting occurred. The Supreme Court of Ohio recognized inState v. Stallings, 89 Ohio St.3d 280, 291, 2000-Ohio-164 that the type weapon used and circumstances constitute a basis upon which a trier of fact may infer a purpose to cause death:
 {¶ 39} "The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapons used, and all the other facts and circumstances in evidence. If a wound is inflicted upon a person with a deadly weapon in themanner calculated to destroy life or inflict great bodily harm, the purpose to cause death may be inferred from the use of the weapon." Id. (Emphasis in the original).
 {¶ 40} Considering the evidence and construing it in favor of the prosecution, we conclude that there was sufficient evidence in the record to prove beyond a reasonable doubt that White purposely caused the death of Middlebrooks using a firearm. A reasonable jury could have found that the essential elements of a violation of R.C. 2903.02(A),2929.02 as well as violation of the firearm specification, R.C. 29141.145, were proved beyond a reasonable doubt in the case. We find Assignment of Error No. II not well-taken.
 Manifest Weight of the Evidence {¶ 41} In his manifest weight of the evidence argument in his first assignment of error, appellant contends that credible evidence is lacking to induce a belief that he *Page 11 
committed murder. Appellant argues that witness Montalvo, the head of bar security, could have mistaken him for another person wearing a cream colored jogging suit. Appellant argues that the weight of Montalvo's testimony should be discounted due to the fact that he made no pretrial identification of appellant. Appellant also claims that Mantalvo's identification of him during trial was "weak."
 {¶ 42} Montalvo, however, testified to "no doubt" that appellant was the shooter. He had seen White at the nightclub during the year before the shooting, from five to as many as ten times. Montalvo's familiarity with White was further demonstrated by the fact that he knew White by his street name, "Fisher." Montalvo testified he had a clear, unobstructed view of the shooting.
 {¶ 43} Appellant argues that Montalvo misidentified the prosecutor standing next to him as the shooter, not the appellant, when making his in-court identification. The state disputes the contention. The record does not support appellant's claim. At the time of the in-court identification at trial, the trial court directed that "[t]he record will reflect he's identified Mr. White, the defendant." Appellant made no objection at trial to the trial court's characterization of Montalvo's identification testimony.
 {¶ 44} Appellant argues that other eyewitness testimony should also be discounted due to the fact that many witnesses were relatives of Otha Randall's wife, Theresa Randall, and that the other eyewitnesses only heard gunfire and saw the victim on the ground.
 {¶ 45} Linda Griswold testified, however, that White was behind the victim when she saw his arm and body jerk and heard a pop. Although she was unable to identify *Page 12 
White in the photo array soon after the shooting, she identified him at trial and recalled that others present at the shooting knew him by name and called out his name as they grabbed at him after the shooting occurred.
 {¶ 46} Theresa Randall and Samuel Walker both confirmed testimony that White was immediately behind the victim when the victim was shot in the back. Antwuan Walker testified that White "tucked a gun in his stomach" after the shooting. Samuel Walker and Otha Randall testified that they saw White with a gun after the shooting as he was pursued by Walker family members. Finally, Jeronica Phillips testified that White admitted he committed the shooting.
 {¶ 47} After reviewing the record and reweighing the evidence, we find that the conviction was not against the manifest weight of the evidence. The conclusion that White purposely caused the death of Middlebrooks using a firearm, in violation of R.C. 2903.02(A), 2929.02, and 29141.145, is supported by competent, credible evidence in the record. We find Assignment of Error No. I is not well-taken.
 Failure to Instruct on Lesser Included Offenses {¶ 48} In Assignment of Error No. VI, appellant contends that failure to instruct the jury on involuntary manslaughter, reckless homicide and negligent homicide was plain error. Appellant contends that each is a lesser included offense to the offense of murder.
 {¶ 49} Ordinarily, absent plain error, failure to object to a jury instruction constitutes a waiver of any claim of error to the instruction. State v. Long (1978), 53 Ohio St.2d 91, 96-97. Crim. R. 52(B) provides a means to avoid waiver under plain error. *Page 13 
"Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long, at paragraph three of the syllabus; State v. Witcher, 6th Dist. No. L-06-1039, 2007-Ohio-3960, ¶ 32.
 {¶ 50} The state argues that appellant's defense at trial was premised upon the claim that appellant did not shoot the victim. The record reflects that trial counsel for appellant argued in closing argument that it did not make sense that White, rather than Otha Randall, committed the crime. Defense counsel argued that Randall, not White, had both motive and the opportunity to shoot Middlebrooks. He argued that the victim had "disrespected" Randall, was "messing with his wife" at the bar, and that the shooting, in front of many witnesses, could only be understood to be a result of "rage, emotion, and alcohol," and that White lacked any motive to commit the offense.
 {¶ 51} Upon review of the record, we conclude that the choice not to seek an instruction on lesser included offenses at trial was a deliberate, tactical decision of trial counsel for appellant. As inState v. Clayton (1980), 62 Ohio St.2d 45, trial counsel elected to pursue acquittal rather than seek an instruction for a lesser included offense.
 {¶ 52} In State v. Clayton, the Ohio Supreme Court considered the issue of whether the trial court committed plain error when it failed to instruct the jury on lesser included offenses to attempted murder. InClayton, counsel requested jury instructions on attempted murder, self-defense and, specifically, "no lesser included offense." Id., 45. The court considered the decision not to request instructions on lesser included offenses a matter of trial strategy, designed to secure a complete acquittal rather than invite *Page 14 
conviction of the defendant to a lesser included offense. Id., 46. TheClayton decision recognized that a criminal defendant has the right to waive instruction on lesser included offenses:
 {¶ 53} "One of appellee's major arguments was that there should have been an instruction on the lesser-included offense of attempted voluntary manslaughter. Even if the defendant did elicit some evidence of mitigating circumstances (fit of anger), he still had the right to intentionally waive a jury instruction on the lesser-included offense of attempted voluntary manslaughter. Having elicited some evidence in mitigation of attempted murder, the court had the duty to instruct on the lesser-included offense, but this in no way affected defendant's concomitant right, through his counsel, to waive the instruction." Id., 47 at fn. 2.
 {¶ 54} After the defendant was convicted of attempted murder, the Ohio Supreme Court refused to find plain error by the trial court in failing to instruct on lesser included offenses. The court concluded: "Counsel's decision to limit the instruction to attempted murder and his client's subsequent conviction do not amount to a manifest miscarriage of justice and are not plain error." Id. at 47-48.
 {¶ 55} Decisions following Clayton have precluded defendants from avoiding the consequences of unsuccessful tactical decisions at trial by arguing that failure to instruct on lesser included offenses constitutes plain error. State v. Miller, 6th Dist. No. E-02-037, 2003-Ohio-6375, ¶ 17;State v. Harris (1998), 129 Ohio App.3d 527, 533.
 {¶ 56} Appellant made a tactical choice not to request jury instructions on lesser included offenses in an effort to secure a total acquittal based upon an argument that he *Page 15 
did not commit the shooting. Under State v. Clayton, we conclude that appellant cannot now assert plain error under Crim. R. 52(B) to avoid the result of his unsuccessful, tactical decision at trial. We find Assignment of Error No. VI is not well-taken.
 Ineffective Assistance of Counsel {¶ 57} In Assignment of Error No. V, appellant argues that his trial attorney provided ineffective assistance of counsel. Appellant asserts that trial counsel was ineffective on two grounds: first, because he failed to seek to obtain a copy of a surveillance video from The Ozone for the night of the shooting and, secondly, counsel failed to request the trial court to provide jury instructions for lesser included offenses of involuntary manslaughter, reckless homicide, and negligent homicide.
 {¶ 58} To establish ineffective assistance of counsel, a criminal defendant must prove two elements: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense."Strickland v. Washington (1984), 466 U.S. 668, 687. Prejudice underStrickland v. Washington requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.
 {¶ 59} Additionally, in considering a claim of ineffective assistance of counsel, a court must be "highly deferential" to trial counsel and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. *Page 16 
at 689. A properly licensed attorney in Ohio is presumed to execute his duties in an ethical and competent manner. State v. Hamblin (1988),37 Ohio St.3d 153, 155-56, sentence reversed on other grounds, Hamblin v.Mitchell (C.A.6, 2003), 354 F.2d 482.
 {¶ 60} We deal with the surveillance video issue first. While the record discloses the existence of available surveillance equipment at The Ozone, appellant admits that the record does not reflect whether the equipment was used on the night of the shooting. On such a record, a court can only speculate whether counsel erred in failing to act to secure copies of any surveillance video and whether the failure to do so prejudiced appellant. To undertake the required analysis underStrickland v. Washington on whether appellant was provided ineffective assistance of counsel requires consideration of materials outside of the record.
 {¶ 61} Where an ineffective assistance of counsel claim requires consideration of materials outside the record of proceedings in the trial court, the claim is not of the type that can be considered on direct appeal. State v. Carter, 89 Ohio St.3d 593, 606, 2001-Ohio-172;State v. Davis, 6th Dist. No. L-05-1056, 2006-Ohio-2350, ¶ 21. Accordingly we conclude appellant's arguments as to ineffective assistance of counsel, based upon failure to secure copies of surveillance video records, are without merit.
 {¶ 62} Appellant also argues that trial counsel was ineffective due to counsel's failure to request a jury instruction on lesser included offenses. The Supreme Court of Ohio has recognized that failure to request an instruction for lesser included offenses without more does not establish ineffective assistance of counsel. State v. Griffie
(1996), *Page 17 74 Ohio St.3d 332. A court would need evidence that the failure to make the request was a reason other than trial strategy. Id. at 333.
 {¶ 63} This court considered in State v. Miller, 6th Dist. No. L-00-1343, 2002-Ohio-5914, an appeal of a murder conviction, where trial counsel had failed to request a jury instruction on the lesser included offense of voluntary manslaughter. As here, "the sole defense presented was that appellant was not the shooter." Id, ¶ 37. Relying on the Ohio Supreme Court decisions in State v. Clayton and State v. Griffie, we held that the failure to request an instruction on the lesser included offense was a result of trial strategy and, therefore, was not a basis to claim ineffective assistance of counsel. Id.
 {¶ 64} Accordingly, we conclude that evidence in the record is lacking to demonstrate ineffective assistance of counsel based upon the decision not to seek a jury instruction on claimed lesser included offenses. Assignment of Error No. V is not well-taken.
 Jury Instruction on Flight {¶ 65} Under Assignment of No. Error III, appellant argues that the trial court abused its discretion when it instructed the jury on flight, over objection. Appellant makes no objection on the basis of the nature of the instruction used. Rather, he claims that the trial court erred by giving any instruction on flight at all.
 {¶ 66} Evidence of flight is admissible to show "consciousness of guilt." State v. Eaton (1969), 19 Ohio St.2d 145, paragraph six of the syllabus; State v. Pitts (Sept. 30, 1997), 6th Dist. No. L-96-259. As stated by the Ohio Supreme Court in the State v. *Page 18 Eaton opinion, "flight from the scene of the homicide tended to disprove defendant's claim that the homicide was an accident." State v.Eaton at 160.
 {¶ 67} A decision to instruct a jury on flight, over objection, is reviewed on appeal under an abuse of discretion standard. State v.Smith, 6th Dist. No. L-05-1350, 2007-Ohio-5592, ¶ 63; State v. Sims
(1984), 13 Ohio App.3d 287, 289. "The term `abuse of discretion' connotes more that an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, quoting State v.Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 68} "Flight from justice `means some escape or affirmative attempt to avoid apprehension.' State v. Wesley, 8th Dist. No. 80684, 2002-Ohio-4429, citing United States v. Felix-Gutierrez (C.A.9, 1991),940 F.2d 1200, 1207." State v. Smith, ¶ 64. Appellant argues that evidence of flight was lacking as White never left the jurisdiction, was one of many who left the scene of the shooting, and that there was no evidence that White even knew he was a suspect.
 {¶ 69} However, there was evidence in the record supporting the conclusion that appellant fled to a car to leave the scene and was being pursued by friends of the victim. Also, appellant was hiding in a closet at the time of his arrest. The jury instruction on flight left to the jury to determine whether contentions as to flight were true and whether appellant's conduct was motivated by "consciousness of guilt" or by "other innocent reasons."
 {¶ 70} We find no abuse of discretion by the trial court in instructing the jury on the issue of flight. The third assignment of error is not well-taken. *Page 19 
 Motion to Suppress Identification Testimony {¶ 71} In Assignment of Error No. IV, appellant argues that the trial court erred in failing to grant appellant's motion to suppress identification testimony. Appellant claims that his photograph in photo arrays police used to identify the shooter shortly after the shooting were unnecessarily suggestive of guilt under Neil v. Biggers (1972),409 U.S. 188. Three witnesses who testified at trial reviewed the arrays: Linda Griswold, Samuel Walker, and Theresa Randall.
 {¶ 72} The trial court conducted an evidentiary hearing on the motion. Appellant limited his grounds for the motion to suppress to objections to the photo arrays themselves. Appellant has claimed that the arrays were unnecessarily suggestive because his hair was in braids in his photograph and that the photograph had a yellow hue.
 {¶ 73} Review of a motion to suppress on appeal presents mixed questions of law and fact. State v. Roberts, 110 Ohio St.3d 71,2006-Ohio-3665, ¶ 100. An appellate court must accept the trial court's findings of fact where they are supported by competent, credible evidence. Id. "`Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. State v. Fanning (1982), 1 Ohio St.3d 19, 1 OBR 57,437 N.E.2d 583. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.'State v. McNamara (1997), 124 Ohio App.3d 706, 707 N.E.2d 539."State v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8. *Page 20 
 {¶ 74} In Neil v. Biggers, the Supreme Court considered due process limitations on use of evidence derived through suggestive identification procedures. The Neil v. Biggers legal standard involves a two-pronged analysis:
 {¶ 75} "When a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances. Neil v. Biggers (1972), 409 U.S. 188, 93 S.Ct. 375,34 L.Ed.2d 401; Manson v. Brathwaite (1977), 432 U.S. 98, 97 S.Ct. 2243,53 L.Ed.2d 140." State v. Waddy (1992), 63 Ohio St.3d 424, 438, superseded by constitutional amendment on other grounds. The first question is whether the identification procedure was unnecessarily suggestive of the defendant's guilt. Id. The second, "is whether, under all the circumstances, the identification was reliable, i.e., whether suggestive procedures created `a very substantial likelihood of irreparable contamination.' Simmons v. United States (1968), 390 U.S. 377, 384,88 S.Ct. 967, 971, 19 L.Ed.2d 1247,1253, quoted in Neil, 409 U.S. at 198,93 S.Ct. at 381, 34 L.Ed.2d at 410." Id. at 439.
 {¶ 76} At the close of the hearing on the motion to suppress, the trial court held that the photo arrays were not suggestive and provided a factual basis for the court's conclusion:
 {¶ 77} "First of all, I have had the opportunity to look at the photo arrays. I see six African American males who appear to be the same or similar age. I see facial hair being the same or similar on each of these gentlemen. I see hairstyles that are essentially the same or similar. And frankly, it is difficult if not impossible to see that Mr. White has *Page 21 
braids. If Mr. White has braids according to the way his hair is viewed in this photograph, then one cold argue that several other of these defendants near the nape area of their neck may have a braid.
 {¶ 78} "We find when we look at all of these matters pursuant to statute and rule we find that these are not suggestive in the sense of the photo array itself."
 {¶ 79} We defer to the trial court as finder of fact its evaluation of the similarities of the photographs in the array and particularly on the finding that "it is difficult if not impossible to see" that the appellant had braids in his photograph and that, even if he did, that the hairstyle remained similar to others photos in the array. These findings of fact are supported by credible evidence in the record.
 {¶ 80} Appellant's photograph that was used in the arrays also had a yellow background hue to the side of the photograph. Two of the five other photographs in the same photo array also include a yellow hue as well, although to a lesser degree. In our view, the yellow hue to the photograph did not improperly focus attention of the witnesses on appellant.
 {¶ 81} We agree with the conclusion of the trial court that the appellant's photograph in the photographic array was not unduly suggestive under Neil v. Biggers analysis. Appellant failed to prove the first prong of the two prong legal standard in Neil v. Biggers. Where it is determined that the identification procedure was not unduly suggestive, no further consideration into reliability is required.State v. Blakely, 6th Dist. No. L-03-1275, 2006-Ohio-185, ¶ 17;State v. Harris, 2d Dist. No. 19796, 2004-Ohio-3570, ¶ 19. We conclude, therefore, that the trial court did not err in overruling the *Page 22 
motion to suppress identification testimony. Accordingly, Assignment of Error No. IV is not well-taken.
 {¶ 82} On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., Arlene Singer, J., concur. *Page 1