OPINION
{¶ 1} The appellant, William Blake, appeals from his conviction of burglary in the Montgomery County Court of Common Pleas. Subsequent to his conviction, the court sentenced him to incarceration for a term of five years. Blake presents three assignments of error for our determination.
 {¶ 2} On September 27, 2004 at around 1:00 a.m., Mr. and Mrs. Joshua King's residence on Edison Street was burglarized while they and their three children were at home sleeping. Mrs. King woke up to see an intruder with a flashlight in the upstairs hallway. She screamed, waking up her husband. Mr. King chased after the burglar, while Mrs. King dialed 9-1-1. Mr. King was unable to catch the burglar, but described him as a black male, about five foot eight inches to five foot ten inches in height, a medium build and in his twenties. Mr. King described the burglar as wearing a red jacket, white t-shirt, and dark colored jeans or pants. King said the burglar was carrying something in his hands as he went out the front door.
 {¶ 3} King went back inside and walked through the house to assess the damage. In the living room, he noticed that the blinds behind the couch were "messed up," the window was open, and the window screen had been "knocked out." King knew that the window was closed and the screen intact before he went to sleep that night. King noticed that the contents of a diaper bag in the living room had been removed, and personal paperwork had been pulled out of the closet in the back room and scattered on the floor of the bathroom. Within a minute of Mrs. King's 9-1-1 call, police officers arrived at the King residence. Dayton police officers Matthew Dickey and Dan Zwiesler were in the area investigating a separate burglary when they received a dispatch regarding a burglary in process at 209 Edison Street, a couple blocks away. Officer Zwiesler responded to the Edison Street location within a minute, just before Officer Dickey arrived. The two officers conducted a brief survey of the outside of the house, taking note of the open window and the screen that was laying on the ground, before making contact with the Kings. When they went inside, Mr. King explained that someone had broken into their house and that he had chased the man behind the house towards Paul Laurence Dunbar Street. King described the man to the officers as a black male, average height, wearing a red jacket, white t-shirt and dark pants. Officer Dickey promptly put out a broadcast over the radio for a suspect with that description.
 {¶ 4} Officer Greg Thornton heard Officer Dickey's broadcast and drove to the area to look for the suspect. Shortly thereafter, Thornton saw someone walking on Negley Place, off of Paul Laurence Dunbar, who matched the description. He radioed to confirm the description, then circled around to Riverview Avenue, where he was able to make contact with the individual coming out of an alley. The individual was a black male, 5'9" or 5'10" in height, average build, wearing a red jacket and white t-shirt, with a backpack or shoulder-style bag slung over his right shoulder. The man, subsequently identified as Blake, was the same person Thornton observed walking on Negley Place. Thornton stopped his cruiser and said, "Sir, we need to talk." Blake stared at him for a moment, then dropped the bag he was carrying and took off running across Riverview Avenue.
 {¶ 5} Officer Thornton gave chase and as he ran, he radioed his location to other crews. Thornton pursued Blake as he ran behind two houses on Riverview, jumped a couple of fences, and ran through an alley. Ultimately, however, Blake was too fast for him, and he lost him.
 {¶ 6} At the same time, Officers Brian Updyke and Jerry Bell heard Officer Thornton's call over the radio and responded to the area of Riverview and Ferguson Avenue to assist in apprehending the suspect. Officer Bell got out of the cruiser and took off on foot while Officer Updyke drove around spotlighting some of the nearby alleys. Officer Bell chose a vacant house in the 700 block of Ferguson and waited behind a line of trees. Within five minutes, he observed a silhouette peek out from the shadow of the house and slowly emerge onto the driveway, walking directly towards him. As the silhouette got closer, Officer Bell saw that it was a black male, identified as Blake, wearing a red jacket, white t-shirt and gray sweat pants. When Blake was approximately ten feet away, Officer Bell stepped out from the trees, drew his weapon, and ordered him to "get down on the ground." Blake said, "okay, you got me," and complied.
 {¶ 7} Officer Thornton returned to his cruiser and made contact with Officer Dickey, who had responded to the area to assist. Officer Dickey had secured the bags that Blake had dropped before running from Officer Thornton, and he discovered that one was a child's backpack containing a woman's purse. Inside the purse was identification belonging to Schira King. The other bag was a vinyl diaper bag containing more of the King's property.
 {¶ 8} Blake was taken into custody and placed in Officer Zwiesler's cruiser, and Thornton identified him as the individual he chased on Riverview Avenue. Officer Zwiesler subsequently transported Blake to the Montgomery County Jail where he was booked in for burglary. During the book-in process, a couple sets of keys and a silver watch were found in his pants pockets, which were later identified as belonging to the Kings'.
 {¶ 9} Blake denied at trial that he was the person who broke into the Kings' house on September 27, 2004. He testified that he was walking to the All-In-One carry out on James H. McGee to get a ride home when he had come across some abandoned bags near the Dayton View Academy. Some of the contents had spilled over onto the ground. Blake said that it "looked like junk" to him. Nevertheless, he testified he stopped and grabbed a set of keys off the grass. Blake claimed that he was looking for tags of ownership when the police cruiser came to a screeching halt beside him. Blake said he looked up and saw a .40 caliber gun with a laser directed at his head and chest. Blake said his immediate reaction was to run. At some point, Blake wondered why he was running, stopped, sat on the porch of a vacant house, and lit a cigarette. Eventually, a police officer approached him. Blake asked, "You want me?" The officer told him to "get down on the ground," and he complied. Blake did not deny having the keys, a chain, and a watch on him when he was arrested, but insisted that he did not take them from the Kings' house. Blake further claimed that he was wearing a blue coat with a red lining on September 27, 2004, and he maintained that he was not wearing the coat inside out on that date.
 {¶ 10} In his first assignment of error, Blake contends he was denied a fair trial because the prosecution engaged in misconduct during the proceedings. Specifically, Blake contends that the prosecution improperly stated several times during the opening statement and closing argument that he was caught "red-handed." Blake contends the prosecutor's characterization of the evidence misstates its strength because he was not apprehended in the Kings' house, was never identified by the Kings as the burglar, his fingerprints were never found in the home, and he was not wearing the clothing described by the Kings to the police. Blake admits his trial counsel failed to object to the prosecution's "caught red-handed" argument, but he contends the error in allowing this argument was "plain error."
 {¶ 11} Blake also contends the prosecution improperly asked jurors a hypothetical question during voir dire to help demonstrate that the jury could convict him upon the strength of circumstantial evidence. The following occurred during the voir dire examination:
 {¶ 12} "MR. HORWITZ: Okay, [d]oes anybody have a problem with the notion that circumstantial evidence can be just as strong as direct evidence? Or even possibly stronger in some cases?
 {¶ 13} "PROSPECTIVE JURORS: (No audible response)
 {¶ 14} "MR. HORWITZ: Does anyone have a problem with that?
 {¶ 15} "PROSPECTIVE JURORS: (No audible response)
 {¶ 16} "MR. HORWITZ: Okay, and by means of a hypothetical: Mom makes a chocolate cake. She leaves it on the kitchen counter and leaves the room. Her son Billy, when she walks back in, has his mouth full, has chocolate icing or frosting on his face. In the kitchen sink, there's a plate and a fork with chocolate on it. When mom asks Billy, `Did you eat the cake?' Billy states, `The dog ate it.' Now, the dog ate it; that's direct evidence. And let's say that Billy's friend Bobby is asked by mom, `Did Billy eat the cake?' and Bobby says, `Yeah, the dog ate it.' Again, direct evidence.
 {¶ 17} "However, in this case, there's circumstantial evidence that mom has. Mom has Billy's mouth full, chocolate frosting on his face, and the plate and fork with chocolate on it in the kitchen sink. In this example, what evidence appears to be stronger?
 {¶ 18} "PROSPECTIVE JURORS: (No audible response)
 {¶ 19} "MR. HORWITZ: Ms. Mann?
 {¶ 20} "PROSPECTIVE JUROR MANN: Circumstantial.
 {¶ 21} "MR. HORWITZ: The circumstantial appears to be stronger in this particular case?
 {¶ 22} "PROSPECTIVE JUROR MANN: Yes.
 {¶ 23} "MR. HORWITZ: Okay. Does anybody here believe that there has to be direct evidence or this case is weak, cannot be proven?
 {¶ 24} "PROSPECTIVE JURORS: (No audible response)
 {¶ 25} "MR. HORWITZ: I see no hands."
 {¶ 26} Blake argues that the hypothetical question was prejudicial to him because it acted to remove his constitutionally guaranteed presumption of innocence and created the impression that he, as "Billy," was guilty prior to the introduction of any evidence. Blake argues that the trial court exacerbated the damage done by the prosecutor's question by bringing the hypothetical question up again rather than instructing the jury to disregard the prosecutor's question.
 {¶ 27} The State argues that the prosecutor's "caught red-handed" statement accurately reflected the evidence presented at trial. The State argues that the prosecutor's hypothetical question was proper to explain how circumstantial evidence can be used to determine guilt and was, after all, only an example despite the use of the hypothetical "Billy" in the question.
 {¶ 28} We agree with Blake that the prosecution improperly engaged in argument during the opening statement when he stated that the defendant was caught "red-handed" within minutes of burglarizing the home of the Kings and when he said the defendant was caught "red-handed" several blocks from the Kings' home with items stolen from this home. The prosecution's "red-handed" remark was argumentative and belonged more properly in the final argument where it was again made by the prosecution. We do not find the prosecutor's remarks prejudicially affected the substantial rights of the defendant. The remarks did not constitute plain error. Slate v. Smith (1984), 14 Ohio St.3d 13, 14,470 N.E.2d 883. In his final argument, the prosecutor reminded the jury that this is a "case of being caught red-handed." (T. 254). He then proceeded to argue that the evidence proved that Blake was indeed caught red-handed committing the burglary of the Kings' home. These remarks were perfectly acceptable final argument by the prosecutor.
 {¶ 29} In State v. Huffman (1912), 86 Ohio St. 229, 99 N.E., 295, the Ohio Supreme Court held that "it is not proper to submit hypothetical questions to the jurors in an effort to learn in advance what they will do in a supposed state of the evidence or upon a supposed state of the facts, and thus possibly commit them to certain ideas or views when the case shall be finally submitted to them for their decision." Id. at 235 (citations omitted).
 {¶ 30} Huffman involved a State's appeal which requested the court rule upon the propriety of certain questions propounded by defense counsel to the prospective jury venire. The Ohio Supreme Court held that was not competent to inquire of a prospective juror whether he will stand upon his opinion of not guilty, formed after due deliberations in the jury room or will yield his opinion merely for the purpose of reaching a verdict in the case. Id. Although the question seemed a fair one, the court was concerned that the hypothetical question asked by the defense counsel might have suggested to the prospective juror that he need not consider the views of jurors who formed a different view of the evidence. Id. at 235-37.
 {¶ 31} Hypothetical questions propounded to prospective jurors are not always objectionable and may be permitted in the discretion of the trial court. The main reasons for considering certain hypothetical questions improper appear to be (1) they tend to entrap, influence, commit, or obtain a pledge from jurors for their decision in advance of hearing their testimony; or (2) are designed to ask about matters of law which are adequately covered by the judge's instructions; or (3) are faulty in form because they are an incorrect or inadequate statement of the law. See Annotation (1965), 99 A. L. R.2d 7, 18.
 {¶ 32} In this case the hypothetical question related to the issue of circumstantial evidence, since the State would be relying on circumstantial evidence to secure its conviction. The prosecution provided the example of "Billy" and the chocolate cake to demonstrate that circumstantial evidence can in some instances be more persuasive than direct evidence. The hypothetical did not include a misstatement of law and it was obvious the chocolate cake example was merely being used to demonstrate the difference between direct and circumstantial evidence. The question did not commit any juror to a decision before the presentation of evidence at the trial. Also, the trial court specifically instructed the jurors that they were not to form any opinion regarding the evidence until they had heard all the evidence and received final instructions from the court.
 {¶ 33} Although the prosecutor should not have used the term "red-handed" in its opening statement, no objection was made to the remark and it did not constitute plain error. Although the prosecutor should not have asked the prospective jurors which evidence was stronger in the hypothetical chocolate cake example, we do not find the question violated the substantial rights of Blake. Plain error is one in which, but for the error, the outcome of the trial clearly would have been different. State v. Long (1978), 53 Ohio St.2d 91, 97, 372 N.E.2d 804. The first assignment of error is overruled.
 {¶ 34} In his second assignment, Blake argues that his trial counsel was ineffective for not objecting to the prosecutor's "red-handed" argument and the hypothetical question. For the reasons previously stated this argument has no merit. He also contends that his counsel was ineffective for not objecting to the court instructing the jury that "the accused's flight and resistance to arrest can be considered by you as evidence of guilt." (T. 277). Flight from justice, and its analogous conduct, may be indicative of a consciousness of guilt. State v.Eaton (1969), 19 Ohio St.2d 145, 160, 249 N.E.2d 897, reversed on other grounds (1972), 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed. 2d 750. See, also,State v. Williams (1997), 79 Ohio St.3d 1, 679 N.E.2d 646. The instruction therefore was proper.
 {¶ 35} Blake contends his counsel was ineffective for not requesting an alibi instruction. Blake admits that he was permitted to testify he was "elsewhere" at the time of the burglary despite the fact counsel did not request an alibi instruction. He contends the alibi instruction found at O.J.I. 411.03 would have assisted the jury in evaluating his claim that he did not commit the burglary of the King residence. The State argues there was no evidence that Blake was elsewhere at the time of the burglary. The instruction referred to by Blake does inform the jury that if the evidence fails to establish that the defendant was elsewhere, such failure does not create an inference that the defendant was present at the time when and at the place where an offense has been committed. We fail to see how this instruction would have assisted the jury in evaluating his claim that he did not commit the burglary. There was uncontroverted testimony that Blake was in the immediate area of the burglary fleeing the police and was found in possession of the King's property.
 {¶ 36} Blake's next argument is that his trial counsel was ineffective for failing to subpoena his friend Kia and his sister who would testify Blake was at Kia's apartment the evening before the burglary. Blake's argument is not persuasive because he testified he left Kia's apartment at 11:50 p.m. and the King burglary did not occur until 1:00 a.m. the next morning.
 {¶ 37} In conclusion, Blake has failed to demonstrate his trial counsel was constitutionally ineffective. The second assignment of error is overruled.
 {¶ 38} In his last assignment, Blake contends his conviction was against the manifest weight of the evidence and was also based on insufficient evidence as a matter of law. This assignment is without merit. Blake notes that the Kings were unable to identify him and Mrs. King described the burglar as being of "medium build" and he weighs 205 pounds, "hardly medium build" he contends. He notes also that Mrs. King thought the burglar was in his twenties but he is a "decade" older. Also, Blake argues the jacket he was found wearing does not match the jacket described by the Kings and he was not in possession of a flashlight when he was apprehended.
 {¶ 39} The State for its part argues that Blake's conviction is neither against the manifest weight nor is it based on insufficient evidence. The State notes that Blake matches generally the description provided by the Kings, he was wearing clothes described by the Kings, and was caught fleeing the police shortly after the burglary in possession of some of the Kings' property. The State notes that officer Bell testified that Blake was wearing a navy-blue jacket turned inside out with the red lining exposed. (T. 126). Bell said Blake was also wearing a white tee shirt and dark colored pants. Lastly, officer Bell testified that Blake said, "You got me," when Blake was apprehended. No one testified regarding Blake's actual age.
 {¶ 40} Officer Darrell Beal explained that he was unable to recover "readable" fingerprints from the King residence for comparison purposes. We agree with the State that the fact that Blake was not still carrying a flashlight when apprehended is of little significance.
 {¶ 41} When determining whether a conviction is against the manifest weight of the evidence, a reviewing court considers "not only the sufficiency of the evidence if believed, but also the believability of the evidence." State v. Jones (1996), 114 Ohio App.3d 306, 324,683 N.E.2d 87. The relevant inquiry in determining the sufficiency of the evidence is, "after viewing the evidence in the light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."State v. Jenks (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492. When conducting a manifest weight analysis, an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v.Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541.
 {¶ 42} We see no evidence the jury lost its way in convicting Blake of the burglary charge. The circumstantial and direct evidence presented by the State in the case was compelling. Certainly a jury could convict Blake on the slate of the evidence. The third assignment is also overruled.
 {¶ 43} The judgment of the trial court is affirmed.
FAIN and DONOVAN, JJ., concur.