[Cite as *State v. Hairston*, 2026-Ohio-656.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff- Appellee, | : | No. 115189 |
| v. | : | |
| DEONDRE HAIRSTON, | : | |
| Defendant-Appellant. | : | |

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 26, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-682777-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Anna Faraglia, Assistant Prosecuting Attorney, *for appellee.*

Wegman Hessler Valore and Matthew O. Williams, *for appellant*.

MICHELLE J. SHEEHAN, A.J.:

{¶ 1} Defendant-appellant Deondre Hairston appeals his conviction for tampering with evidence. He raises two assignments of error for our review:

1. The trial court erred in denying [Hairston's] Rule 29 motion with respect to tampering with evidence.

2. [Hairston's] conviction for tampering with evidence is against the manifest weight of the evidence.

{¶ 2} After review, we find no merit to Hairston's arguments and affirm the trial court's judgment.

## I. Procedural History and Factual Background

{¶ 3} In July 2023, Hairston was charged with several counts of murder and one count each of felonious assault, endangering children, obstructing justice, and tampering with evidence after his 27-day old child was found unresponsive and pronounced dead soon after arrival at the hospital. The child's death was ruled a homicide caused by blunt force trauma to the head.

{¶ 4} After a jury trial, Hairston was found guilty of tampering with evidence, a third-degree felony in violation of R.C. 2921.12(A)(1), but not guilty of all other charges.[1] The following facts relevant to Hairston's conviction of tampering with evidence were presented at trial.

{¶ 5} On July 3, 2023, Hairston and Diamond Caldwell, the mother of the child, along with several other family members, went to the Cleveland Zoo during the day. According to all accounts, the child was "fussy" at the zoo because he had thrush but was otherwise fine.

---

[1] The State dismissed Count 5, obstructing justice, at the close of its evidence.

{¶ 6} When they got home from the zoo, Michelle Murphy, who is Caldwell's aunt, watched the child around 6:00 p.m. while Caldwell and Hairston went to the store to buy diapers. In July 2023, Murphy lived in a house on the same property as Caldwell and Hairston's house; Murphy's house sat at the front of the property, and Caldwell and Hairston's house was behind Murphy's. As of July 2023, Hairston had lived at the house with Caldwell for approximately one-and-a-half years. According to Murphy, Caldwell then got the baby around 7:00 p.m. and Murphy did not see them again that evening.

{¶ 7} Neither Caldwell nor Hairston testified at trial. But Detective Lisette Gonzalez testified to what she learned during her investigation regarding what occurred in the house on the evening of July 3, 2023, after Hairston and Caldwell returned home after buying diapers and getting the child from Murphy's home.[2] Hairston, Caldwell, and Hairston's cousin, Michael Berry, spent time together in the living room with the child that evening. At some point, Caldwell went to bed in her bedroom, which was on the first floor of the house. Caldwell left the child in his bouncer with Hairston and Berry.

{¶ 8} Around 2:00 or 3:00 a.m., Hairston took the child to Caldwell's bedroom and placed him on the bed in his bouncer next to Caldwell. Hairston told police that the child was not crying when he put him on the bed. Hairston and Berry

---

[2] Hairston initially lied to police, which will be discussed below.

then went upstairs to "smoke." Sometime later, Hairston came back downstairs and went to sleep on the couch in the living room.

{¶ 9} On the morning of July 4, 2023, Caldwell woke up around 7:00 a.m. and found the child unresponsive. She woke Hairston up and told him that something was wrong with the child. Caldwell texted her stepmother, Tiffany Ferrer, a photo of the baby and asked her what she should do. Ferrer told her to take the child to the hospital or call 911. Ferrer testified that when she looked at the photo of the baby, she thought that he had already passed away. Ferrer could also see bruises on the child in the photo.

{¶ 10} Caldwell texted Murphy at 7:17 a.m. and told her that she needed the keys to the car. Murphy did not see the text but woke up to Caldwell pounding on her door, yelling that something was wrong with the child. Murphy handed the keys for the gray Kia Soul, which belonged to Murphy's mother, to someone but could not see who she handed them to. Murphy did not look out the window but heard three car doors shut.

{¶ 11} Hairston drove the Kia to the hospital. Caldwell sat in the front passenger seat, and Berry sat in the back of the car next to the child. When they arrived at the hospital at 7:59 a.m., Caldwell and Berry got out of the vehicle, and Caldwell took the child into the hospital. Berry got into the front passenger seat of the vehicle, and Hairston drove away.

{¶ 12} According to the doctor working in the emergency room on July 4, 2023, the child did not have a pulse when he arrived. Hospital doctors began

resuscitations on the child and attempted other procedures but were unable to revive him. The doctor pronounced the baby's time of death to be 8:22 a.m., but she explained that that the child's actual time of death was unknown. The doctor further testified that she had concerns about the baby because of his appearance. She testified that he had marks on his body that indicated he may have been subject to trauma, so she notified the police officers of this fact.

{¶ 13} Caldwell texted Hairston that the baby had died and told him to come back to the hospital. Hairston and Berry came back to the hospital. Hairston and Caldwell spoke to police at the hospital and then met them at their home to reenact how they found the baby that morning.

{¶ 14} Caldwell's grandmother testified that she tried to call Caldwell on July 4, 2023, when she was at the hospital. She said that Hairston answered Caldwell's phone and, when he learned who it was, he hung up on her.

{¶ 15} On July 5, 2023, Caldwell, Hairston, and their friends and family released balloons outside of their home in honor of the baby. Murphy said that Hairston and Berry were "hovering" over Caldwell the whole time. Caldwell's grandmother testified that she did not get the chance to talk to her granddaughter all day because Hairston had his arm around her the entire day. Caldwell's grandmother further stated that she tried to give Caldwell a hug but that Hairston and Berry "were on her like glue."

{¶ 16} Caldwell's stepmother testified that although Hairston cried at the balloon release, he was playing video games after "like nothing happened."

Caldwell's stepmother also said that Caldwell and Murphy's relationship was "stressed."

{¶ 17} Detective Gonzalez learned on July 5, 2023, from the doctor who performed the autopsy that the cause of the baby's death was blunt force trauma to the head. Detective Gonzalez also learned that the baby had abrasions and bruising to his head, neck, and face and that it appeared as if he had been choked. The autopsy doctor testified that the child would have died within two hours of the initial trauma.

{¶ 18} After receiving the autopsy results, Detective Gonzalez asked Caldwell and Hairston to come to her office. Detective Gonzalez explained that she wanted to ask Hairston why he lied to her. Detective Gonzalez explained that Hairston and Berry had both initially told Detective Gonzalez that Hairston was not present when Caldwell found the child unresponsive. Hairston told Detective Gonzalez that he had spent the night with his other child's mother. Hairston and Berry had also told Detective Gonzalez that Berry drove Caldwell to the hospital on the morning of July 4, 2023, and that Hairston did not go.

{¶ 19} Detective Gonzalez told Hairston that she learned from security cameras at the hospital that the statements he gave to her about not being in the car when Caldwell arrived at the hospital were not correct. Hairston then admitted that he had been home when Caldwell found the child unresponsive and had driven Caldwell and the child to the hospital. Hairston told Detective Gonzalez that he initially lied because "he was scared because he had a gun in the house." Detective

Gonzalez arrested Hairston that day and confiscated his, Berry's, and Caldwell's cell phones.[3]

{¶ 20} On July 6, 2023, Detective Gonzalez learned that Murphy had called the police to report that there was "potentially a onesie in a vehicle in the driveway that had blood stains on" it. When Detective Gonzalez arrived, he said Murphy appeared to be intoxicated because she was slurring her words and "swaying." Other officers had already seen the onesie in the vehicle and called to have the vehicle towed to be processed. Detective Gonzalez learned that the vehicle belonged to Hairston. Detective Gonzalez obtained a search warrant for Hairston's vehicle and Caldwell and Hairston's home.

{¶ 21} Murphy testified that on July 6, 2023, she went to retrieve something out of Hairston's vehicle, which was parked in her driveway. She said that she saw a plastic bag with something white in it under the driver's seat. She called the police. She denied that she had been drinking on July 6, 2023. She also denied that she told police that the onesie had blood on it.

{¶ 22} Detective Gonzalez said that when she interviewed Murphy in March 2024, Murphy did not remember her statements from the previous July 2023 interview. She told Detective Gonzalez in March 2024 that she called the police only

---

[3] Detective Gonzalez also arrested Caldwell and Berry. They were both charged with multiple counts of murder and one count each of felonious assault, endangering children, obstructing justice, and tampering with evidence. Caldwell pleaded guilty to endangering children, a third-degree felony, and Berry pleaded guilty to obstructing justice, a fifth-degree felony.

because she wanted to get Hairston's vehicle out of her driveway. Murphy also told police in March 2024 that she never looked inside Hairston's vehicle on July 6, 2023. Rather, Murphy stated in the March 2024 interview that it had been Caldwell's father who looked inside Hairston's vehicle on July 6, 2023.

{¶ 23} Murphy would not admit on cross-examination that she was upset that Caldwell was in an interracial relationship. When shown text messages that she sent to Caldwell calling Hairston a "mother f-ing n*gger," she testified, "They all call each other that, though."

{¶ 24} Detective Gonzalez reviewed the photos that were admitted into evidence. She explained that after extracting data from Caldwell's cell phone, they found photos of the child taken on the evening of July 3, 2023, at 8:52 and 11:21 p.m. that show the child was wearing a white onesie that said "cutest catch" on the front of it. But in the photo of the child that Caldwell took the next morning at 7:36 a.m., the child was wearing only a diaper.

{¶ 25} When officers searched Caldwell and Hairston's home, they found a burping cloth, a blue onesie, and two white onesies. They also collected the other white onesie from Hairston's vehicle, which said "cutest catch" on the front of it. These five items were processed for trace evidence, and items that tested positive for presumptive blood or other bodily fluids were sent for DNA testing.

{¶ 26} The supervisor of the Trace Evidence Unit at the Cuyahoga County Medical Examiner's Office testified that the underside of the burping and the front and back of the white onesie found in Hairston's vehicle "tested presumptive

positive for blood." The items that tested positive for presumptive blood were sent for DNA testing. The DNA on the burping cloth matched the child's DNA and one unknown contributor. The DNA on the front and back of the white onesie found in Hairston's vehicle matched the child's DNA, Hairston's DNA, and a third unknown contributor.

{¶ 27} The State rested and moved to dismiss the count charging Hairston with obstruction of justice, which the trial court granted. Hairston then moved for a Crim.R. 29 acquittal on the remaining charges, which the trial court denied. Hairston presented Berry to testify on Hairston's behalf.

{¶ 28} Berry testified that he initially lied to police about Hairston being present when the child was found unresponsive because Hairston told him to. But he also said that he was scared and confused. Berry denied seeing what happened to the child. He stated that he believed that the child was already dead when they drove to the hospital. Berry believed that Hairston asked him to lie because Hairston had a gun in the home.

{¶ 29} The jury found Hairston guilty of only tampering with evidence. The trial court sentenced him to 36 months in prison. It is from this judgment that Hairston now appeals.

## II. Law and Analysis

{¶ 30} In his first and second assignments of error, Hairston argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal with respect to

his conviction for tampering with evidence and that his conviction for that offense was against the manifest weight of the evidence.

### A. Motion for Acquittal

**{¶ 31}** Hairston argues that there was no evidence regarding who removed the onesie from the child, placed it in the plastic bag, and put it under the seat of his vehicle. Hairston asserts that "most importantly, there was no evidence at all that it was [him] who took the onesie off the child, put it in the bag, and put the bag in the car." Because the State failed to present evidence of these facts, Hairston contends that it was insufficient to convict him and the trial court erred by not granting his motion for acquittal.

**{¶ 32}** Crim.R. 29(A) provides that a court "shall order the entry of a judgment of acquittal of one or more offenses . . . if the evidence is insufficient to sustain a conviction of such offense or offenses. . . ." A Crim.R. 29 motion questions the sufficiency of the evidence, and we apply the same standard of review to a trial court's ruling on a Crim.R. 29 motion as we do in reviewing challenges to the sufficiency of the evidence presented at trial. *Fairview Park v. Peah*, 2021-Ohio-2685, ¶ 37 (8th Dist.).

**{¶ 33}** When considering a challenge to the sufficiency of the evidence, we review the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997).

{¶ 34} To establish that Hairston committed tampering with evidence, the State had to present evidence that he knew that "an official proceeding or investigation" was in progress or was "about to be or likely to be instituted" and that he "alter[ed], destroy[ed], conceal[ed], or remove[d] any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." R.C. 2921.12(A)(1). After review, we conclude that the State presented evidence on each of these elements, that if believed, was sufficient for the jury to conclude beyond a reasonable doubt that Hairston committed tampering with evidence.

{¶ 35} The State presented evidence that the child was wearing the white onesie with "cutest catch" on the front of it on the evening of July 3, 2023 — as late as 11:21 p.m. — but was not wearing it on the morning of July 4, 2023. Hairston and Berry were with the child from the time that Caldwell went to bed until sometime around 2:00 or 3:00 a.m. Detective Gonzalez testified that she learned in her investigation that Caldwell woke up and found the child unresponsive around 7:00 a.m. She immediately woke Hairston up to tell him that something was wrong

with the child. The child was only wearing a diaper in the photo that Caldwell sent to her stepmother at 7:36 a.m.

{¶ 36} While Hairston is correct that three people had access to the child from 11:21 p.m. on July 3 until 7:36 a.m. on July 4, Hairston's DNA was found on the white onesie. Moreover, Hairston lied to police about his whereabouts on the night of July 3 and the morning of July 4. He also lied about driving Caldwell to the hospital. When Detective Gonzalez confronted Hairston that she knew he had lied, he said that he did so because he had a gun in the house. And Berry told Detective Gonzalez that he lied about Hairston's whereabouts because he was confused *and* because Hairston asked him to.

{¶ 37} A defendant's guilt may be inferred from the defendant's conduct to avoid being implicated in a crime, such as concealing evidence or otherwise lying about his involvement. *State v. Robinson*, 2008-Ohio-3498, ¶ 202 (6th Dist.), citing *State v. Tressler*, 2003-Ohio-1418, ¶ 42 (6th Dist.), citing *State v. Eaton*, 19 Ohio St.2d 145, 160 (1969) ("The law is clear that lies told by an accused are admissible evidence of consciousness of guilt, and thus of guilt itself."); *see also State v. Williams*, 2003-Ohio-4396, ¶ 54 (where his statement to the police was contradicted by physical evidence, "[t]he trier of fact was at liberty to infer consciousness of guilt from Williams's lie").

{¶ 38} Viewing the evidence in a light most favorable to the State, we conclude that Hairston's conviction for tampering with evidence was supported by

sufficient evidence. Accordingly, the trial court did not err when it denied his motion for acquittal.

## B. Manifest Weight of the Evidence

{¶ 39} Hairston raises three issues with respect to manifest weight of the evidence. Hairston first argues that this conviction was against the manifest weight of the evidence based on the same arguments that he made with respect to sufficiency of the evidence, i.e., he maintains that there was no evidence that he removed the onesie from the child, placed it in a bag, and put it under the seat of his vehicle with the intent to impede an impending investigation.

{¶ 40} Next, Hairston argues that "there is the issue of timeline." Hairston points to the fact that the onesie was not found until two days after the child had died. He asserts that in that "intervening time, countless individuals, many unknown, had access to the house and [car]."

{¶ 41} And finally, Hairston claims that Murphy's testimony was "problematic" because the evidence showed that she did not like Hairston, she did not like the fact that her niece was in an interracial relationship, she was intoxicated when she reported that she found the onesie in Hairston's car, and she denied on the witness stand that she initially reported to the police that the onesie that she saw in Hairston's vehicle was "bloody."

{¶ 42} While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest-weight challenge questions whether the State has met its burden of persuasion. *Thompkins*, 78 Ohio

St.3d at 390. Weight of the evidence addresses the evidence's "*effect of inducing belief.*" (Emphasis in original.) *Id.* at 387, quoting *Black's Law Dictionary* (6th Ed. 1990). "'[E]ven if a trial judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re Z.C.*, 2023-Ohio-4703, ¶ 14, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12.

{¶ 43} When a defendant argues that his or her conviction is against the manifest weight of the evidence, we "must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* citing *id.* at ¶ 20. "However, '[r]eversal on the manifest weight of the evidence and remand for a new trial are not to be taken lightly.'" *Id.* at ¶ 16, quoting *id.* at ¶ 31.

{¶ 44} We find no merit to Hairston's arguments that his conviction was against the manifest weight of the evidence because there was no evidence that he removed the onesie from the child, placed it in a bag, and put it under the seat of his vehicle with the intent to impede an impending investigation. As we previously stated, Hairston's DNA was found on the child's onesie that had blood on it in multiple places and he lied about being home on the night of July 3 and the morning of July 4. He also lied when he told police that he did not drive Caldwell to the hospital. The jury was free to conclude that Hairston lied because he was guilty.

{¶ 45} Regarding Hairston's argument that his conviction was against the manifest weight of the evidence because the onesie was not found until two days after the baby died, we find no merit to this argument. Although multiple people could have had access to the onesie and placed it in Hairston's vehicle, DNA testing proved that his DNA was on the onesie.

{¶ 46} We also find no merit to Hairston's argument that his conviction was against the manifest weight of the evidence because Murphy did not like him, was racist, and intoxicated when she called the police to report the onesie. Even assuming all those things are true, Hairston's DNA was found on the child's onesie. The jury could also take into consideration the fact that Hairston lied to police.

{¶ 47} Here, the jury was in the best position to judge the credibility of witnesses presented at trial. The jury heard the testimony of Detective Gonzalez about Hairston's multiple lies and heard his reason for lying. It is reasonable to presume that the jury did not believe that Hairston lied because he had a gun in the house, something entirely unrelated to the baby's death. It was entirely reasonable for the jury to conclude that Hairston hid the onesie under the seat of his car because his DNA was found on the onesie — despite the inconsistencies in Murphy's testimony versus her statements to police in July 2023 and March 2024.

{¶ 48} We therefore conclude that this was not "'the exceptional case in which the evidence weigh[ed] heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 49} Hairston's first and second assignments of error are overruled.

**{¶ 50}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, ADMINISTRATIVE JUDGE

SEAN C. GALLAGHER, J., and
DEENA R. CALABRESE, J., CONCUR